Justice Alito
announced the judgment of the Court and delivered an opinion, in which The Chief Justice and Justice Kennedy join.
This is a lawsuit in which it was claimed that conferences held as part of the President’s Faith-Based and Community Initiatives program violated the Establishment Clause of the First Amendment because, among other things, President Bush and former Secretary of Education Paige gave speeches that used “religious imagery” and praised the efficacy of faith-based programs in delivering social services. *593 The plaintiffs contend that they meet the standing requirements of Article III of the Constitution because they pay federal taxes.
It has long been established, however, that the payment of taxes is generally not enough to establish standing to challenge an action taken by the Federal Government. In light of the size of the federal budget, it is a complete fiction to argue that an unconstitutional federal expenditure causes an individual federal taxpayer any measurable economic harm. And if every federal taxpayer could sue to challenge any Government expenditure, the federal courts would cease to function as courts of law and would be cast in the role of general complaint bureaus.
In Flast v. Cohen, 392 U. S. 83 (1968), we recognized a narrow exception to the general rule against federal taxpayer standing. Under Flast, a plaintiff asserting an Establishment Clause claim has standing to challenge a law authorizing the use of federal funds in a way that allegedly violates the Establishment Clause. In the present case, Congress did not specifically authorize the use of federal funds to pay for the conferences or speeches that the plaintiffs challenged. Instead, the conferences and speeches were paid for out of general Executive Branch appropriations. The Court of Appeals, however, held that the plaintiffs have standing as taxpayers because the conferences were paid for with money appropriated by Congress.
The question that is presented here is whether this broad reading of Flast is correct. We hold that it is not. We therefore reverse the decision of the Court of Appeals.
I
A
In 2001, the President issued an executive order creating the White House Office of Faith-Based and Community Initiatives within the Executive Office of the President. Exec. Order No. 13199, 3 CFR 752 (2001 Comp.). The purpose of *594 this new office was to ensure that “private and charitable community groups, including religious ones ... have the fullest opportunity permitted by law to compete on a level playing field, so long as they achieve valid public purposes” and adhere to “the bedrock principles of pluralism, nondiscrimination, evenhandedness, and neutrality.” Ibid. The office was specifically charged with the task of eliminating unnecessary bureaucratic, legislative, and regulatory barriers that could impede such organizations’ effectiveness and ability to compete equally for federal assistance. Id., at 752-753.
By separate executive orders, the President also created Executive Department Centers for Faith-Based and Community Initiatives within several federal agencies and departments.[1] These centers were given the job of ensuring that faith-based community groups would be eligible to compete for federal financial support , without impairing their independence or autonomy, as long as they did “not use direct Federal financial assistance to support any inherently religious activities, such as worship, religious instruction, or proselytization.” Exec. Order No. 13279, 3 CFR §2(f), p. 260 (2002 Comp.). To this end, the President directed that “[n]o organization should be discriminated against on the basis of religion or religious belief in the administration or distribution of Federal financial assistance under social service programs,” id., § 2(c), at 260, and that “[a]ll organizations that receive Federal financial assistance under social services programs should be prohibited from discriminating against beneficiaries or potential beneficiaries of the social services programs on the basis of religion or religious belief,” id., § 2(d), at 260. Petitioners, who have been sued in their official capacities, are the directors of the White House Office and various Executive Department Centers.
*595 No congressional legislation specifically authorized the creation of the White House Office or the Executive Department Centers. Rather, they were “created entirely within the executive branch ... by Presidential executive order.” Freedom From Religion Foundation, Inc. v. Chao, 433 F. 3d 989, 997 (CA7 2006). Nor has Congress enacted any law specifically appropriating money for these entities’ activities. Instead, their activities are funded through general Executive Branch appropriations. For example, the Department of Education’s Center is funded from money appropriated for the Office of the Secretary of Education, while the Department of Housing and Urban Development’s Center is funded through that Department’s salaries and expenses account. See GAO, Faith-Based and Community Initiative: Improvements in Monitoring Grantees and Measuring Performance Could Enhance Accountability 21 (GAO-06-616, June 2006), online at http://www.gao.gov/new.items/d06616.pdf (as visited June 25,2007, and available in Clerk of Court’s case file); see also Amended Complaint in No. 04-C-381-S (WD Wis.), ¶ 23, App. to Pet. for Cert. 71a-72a.
B
The respondents are Freedom From Religion Foundation, Inc., a nonstock corporation “opposed to government endorsement of religion,” id., ¶ 5, App. to Pet. for Cert. 68a, and three of its members. Respondents brought suit in the United States District Court for the Western District of Wisconsin, alleging that petitioners violated the Establishment Clause by organizing conferences at which faith-based organizations allegedly “are singled out as being particularly worthy of federal funding . . . , and the belief in God is extolled as distinguishing the claimed effectiveness of faith-based social services.” Id., ¶ 32, App. to Pet. for Cert. 73a. Respondents further alleged that the content of these conferences sent a message to religious believers “that they are insiders and favored members of the political community” *596 and that the conferences sent the message to nonbelievers “that they are outsiders” and “not full members of the political community.” Id., ¶ 37, App. to Pet. for Cert. 76a. In short, respondents alleged that the conferences were designed to promote, and had the effect of promoting, religious community groups over secular ones.
The only asserted basis for standing was that the individual respondents are federal taxpayers who are “opposed to the use of Congressional taxpayer appropriations to advance and promote religion.” Id., ¶ 10, App. to Pet. for Cert. 69a; see also id., ¶¶ 7-9, App. to Pet. for Cert. 68a-69a. In their capacity as federal taxpayers, respondents sought to challenge Executive Branch expenditures for these conferences, which, they contended, violated the Establishment Clause.
C
The District Court dismissed the claims against petitioners for lack of standing. See Freedom From Religion Foundation, Inc. v. Towey, No. 04-C-381-S (WD Wis., Nov. 15, 2004), App. to Pet. for Cert. 27a-35a. It concluded that under Flast, 392 U. S. 83, federal taxpayer standing is limited to Establishment Clause challenges to the constitutionality of “ ‘exercises of congressional power under the taxing and spending clause of Art. I, §8.’” App. to Pet. for Cert. 31a (quoting Flast, supra, at 102). Because petitioners in this case acted “at the President’s request and on the President’s behalf” and were not “charged with the administration of a congressional program,” the District Court concluded that the challenged activities were “not ‘exercises of congressional power’” sufficient to provide a basis for taxpayer standing under Flast. App. to Pet. for Cert. 33a-34a.
A divided panel of the United States Court of Appeals for the Seventh Circuit reversed. 433 F. 3d 989. The majority read Flast as granting federal taxpayers standing to challenge Executive Branch programs on Establishment Clause grounds so long as the activities are “financed by a eongres *597 sional appropriation.” 433 F. 3d, at 997. This was the case, the majority concluded, even where “there is no statutory program” enacted by Congress and the funds are “from appropriations for the general administrative expenses, over which the President and other executive branch officials have a degree of discretionary power.” Id., at 994. According to the majority, a taxpayer has standing to challenge anything done by a federal agency or officer so long as “the marginal or incremental cost to the taxpaying public of the alleged violation of the establishment clause” is greater than “zero.” Id., at 995.
In dissent, Judge Ripple opined that the majority’s decision reflected a “dramatic expansion of current standing doctrine,” id., at 997, that “cuts the concept of taxpayer standing loose from its moorings,” id., at 998. Noting that “[t]he executive can do nothing without general budget appropriations from Congress,” id., at 1000, he criticized the majority for overstepping Flast’s requirement that a “plaintiff must bring an attack against a disbursement of public funds made in the exercise of Congress’ taxing and spending power,” 433 F. 3d, at 1000 (emphasis in original).
The Court of Appeals denied en bane review by a vote of 7 to 4. Freedom, From Religion Foundation, Inc. v. Chao, 447 F. 3d 988 (CA7 2006). Concurring in the denial of rehearing, Chief Judge Flaum expressed doubt about the panel decision, but noted that “the obvious tension which has evolved in this area of jurisprudence... can only be resolved by the Supreme Court.” Ibid. We granted certiorari to resolve this question, 549 U. S. 1074 (2006), and we now reverse.
II
A
Article III of the Constitution limits the judicial power of the United States to the resolution of “Cases” and “Controversies,” and “‘Article III standing . . . enforces the Con *598 stitution’s case-or-controversy requirement.’” Daimler-Chrysler Corp. v. Cuno, 547 U. S. 332, 342 (2006) (quoting Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 11 (2004)). “ ‘No principle is more fundamental to the judiciary’s proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.’” Raines v. Byrd, 521 U. S. 811, 818 (1997) (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U. S. 26, 37 (1976)).
“[O]ne of the controlling elements in the definition of a case or controversy under Article III” is standing. ASARCO Inc. v. Kadish, 490 U. S. 605, 613 (1989) (opinion of Kennedy, J.). The requisite elements of Article III standing are well established: “A plaintiff must allege personal injury fairly traceable to the defendant’s allegedly unlawful conduct and likely to be redressed by the requested relief.” Allen v. Wright, 468 U. S. 737, 751 (1984).
The constitutionally mandated standing inquiry is especially important in a case like this one, in which taxpayers seek “to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.” ASARCO, supra, at 613 (opinion of Kennedy, J.). This is because “[t]he judicial power of the United States defined by Art. Ill is not an unconditioned authority to determine the constitutionality of legislative or executive acts.” Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464, 471 (1982). The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit “solely, to decide on the rights of individuals,” Marbury v. Madison, 1 Cranch 137, 170 (1803), and must “‘refrai[n] from passing upon the constitutionality of an act . . . unless obliged to do so in the proper performance of our judicial function, when the question is raised by a party whose interests entitle him to raise it,’ ” Valley Forge, *599 supra, at 474 (quoting Blair v. United States, 250 U. S. 273, 279 (1919)). As we held over 80 years ago, in another case involving the question of taxpayer standing:
“We have no power per se to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification for some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. . . . The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally,Frothingham v. Mellon, decided with Massachusetts v. Mellon, 262 U. S. 447, 488 (1923).
B
As a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable “personal injury” required for Article III standing. Of course, a taxpayer has standing to challenge the collection of a specific tax assessment as unconstitutional; being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer. See, e. g., Follett v. Town of McCormick, 321 U. S. 573 (1944) (invalidating tax on preaching on First Amendment grounds). But that is not the interest on which respondents assert standing here. Rather, their claim is that, having paid lawfully collected taxes into the Federal Treasury at some point, they have a continuing, legally cognizable interest in ensuring that those funds are not used by the Government in a way that violates the Constitution.
We have consistently held that this type of interest is too generalized and attenuated to support Article III standing. *600 In Frothingham, a federal taxpayer sought to challenge federal appropriations for mothers’ and children’s health, arguing that federal involvement in this area intruded on the rights reserved to the States under the Tenth Amendment and would “increase the burden of future taxation and thereby take [the plaintiff’s] property without due process of law.” 262 U. S., at 486. We concluded that the plaintiff lacked the kind of particularized injury required for Article III standing:
“[I]nterest in the moneys of the Treasury ... is shared with millions of others; is comparatively minute and indeterminable; and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity.
“The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern.” Id., at 487.
Because the interests of the taxpayer are, in essence, the interests of the public at large, deciding a constitutional claim based solely on taxpayer standing “would be[,] not to decide-a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess.” Id., at 489; see also Alabama Power Co. v. Ickes, 302 U. S. 464, 478-479 (1938).
In Doremus v. Board of Ed. of Hawthorne, 342 U. S. 429, 433 (1952), we reaffirmed this principle, explaining that “the interests of a taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court over their manner of expenditure.” We therefore rejected a state taxpayer’s claim of standing to challenge a *601 state law authorizing public school teachers to read from the Bible because “the grievance which [the plaintiff] sought to litigate ... is not a direct dollars-and-cents injury but is a religious difference.” Id., at 434. In so doing, we gave effect to the basic constitutional principle that
“a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen’s interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an Article III ease or controversy.” Lujan v. Defenders of Wildlife, 504 U. S. 555, 573-574 (1992).[2]
*602 C
In Flast, the Court carved out a narrow exception to the general constitutional prohibition against taxpayer standing. The taxpayer-plaintiffs in that case challenged the distribution of federal funds to religious schools under the Elementary and Secondary Education Act of 1965, alleging that such aid violated the Establishment Clause. The Court set out a two-part test for determining whether a federal taxpayer has standing to challenge an allegedly unconstitutional expenditure:
“First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, §8.” 392 U. S., at 102-103.
The Court held that the taxpayer-plaintiffs in Flast had satisfied both prongs of this test: The plaintiff’s “constitutional challenge [was] made to an exercise by Congress of its *603 power under Art. I, §8, to spend for the general welfare,” and she alleged a violation of the Establishment Clause, which “operates as a specific constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, §8." Id., at 103-104.
Ill
A
Respondents argue that this case falls within the Flast exception, which they read to cover any “expenditure of government funds in violation of the Establishment Clause.” Brief for Respondents 12. But this broad reading fails to observe “the rigor with which the Flast exception to the Frothingham principle ought to be applied.” Valley Forge, 454 U. S., at 481.
The expenditures at issue in Flast were made pursuant to an express congressional mandate and a specific congressional appropriation. The plaintiff in that case challenged disbursements made under the Elementary and Secondary Education Act of 1965, 79 Stat. 27. That Act expressly appropriated the sum of $100 million for fiscal year 1966, § 201(b), id., at 36, and authorized the disbursement of those funds to local educational agencies for the education of low-income students, see Flast, supra, at 86. The Act mandated that local educational agencies receiving such funds “ma[k]e provision for including special educational services and arrangements (such as dual enrollment, educational radio and television, and mobile educational services and equipment)” in which students enrolled in private elementary and secondary schools could participate, §2, 79 Stat. 30-31. In addition, recipient agencies were required to ensure that “library resources, textbooks, and other instructional materials” funded through the grants “be provided on an equitable basis for the use of children and teachers in private elementary and secondary schools,” § 203(a)(3)(B), id., at 37.
*604 The expenditures challenged in Flast, then, were funded by a specific congressional appropriation and were disbursed to private schools (including religiously affiliated schools) pursuant to a direct and unambiguous congressional mandate.[3] Indeed, the Flast taxpayer-plaintiffs’ constitutional claim was premised on the contention that if the Government’s actions were “ ‘within the authority and intent of the Act, the Act is to that extent unconstitutional and void.’” Flast, supra, at 90. And the judgment reviewed by this Court in Flast solely concerned the question whether “if [the challenged] expenditures are authorized by the Act the statute constitutes a ‘law respecting an establishment of religion’ and a law ‘prohibiting the free exercise thereof’” under the First Amendment. Flast v. Gardner, 271 F. Supp. 1, 2 (SDNY 1967).
Given that the alleged Establishment Clause violation in Flast was funded by a specific congressional appropriation and was undertaken pursuant to an express congressional mandate, the Court concluded that the taxpayer-plaintiffs had established the requisite “logical link between [their taxpayer] status and the type of legislative enactment attacked.” In the Court’s words, “[t]heir constitutional challenge [was] made to an exercise by Congress of its power under Art. I, §8, to spend for the general welfare.” 392 U. S., at 102,103. But as this Court later noted, Flast “limited taxpayer standing to challenges directed ‘only [at] exercises of congressional power’ ” under the Taxing and Spending Clause. Valley Forge, supra, at 479.
*605 B
The link between congressional action and constitutional violation that supported taxpayer standing in Flast is missing here. Respondents do not challenge any specific congressional action or appropriation; nor do they ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional. That is because the expenditures at issue here were not made pursuant to any Act of Congress. Rather, Congress provided general appropriations to the Executive Branch to fund its day-to-day activities.[4] These appropriations did not expressly authorize, direct, or even mention the expenditures of which respondents complain. Those expenditures resulted from executive discretion, not congressional action.
We have never found taxpayer standing under such circumstances. In Valley Forge, we held that a taxpayer lacked standing to challenge “a decision by [the federal Department of Health, Education and Welfare] to transfer a parcel of federal property” to a religious college because this transfer was “not a congressional action.” 454 U. S., at 479. In fact, the connection to congressional action was closer in Valley Forge than it is here, because in that case, the “particular Executive Branch action” being challenged was at least “arguably authorized” by the Federal Property and Administrative Services Act of 1949, which permitted federal agencies to transfer surplus property to private entities. Ibid., n. 15. Nevertheless, we found that the plaintiffs lacked standing because Flast “limited taxpayer standing to challenges directed ‘only [at] exercises of congressional power’ ” under the Taxing and Spending Clause. 454 U. S., at 479 (quoting Flast, supra, at 102).[5]
*606 Similarly, in Schlesinger v. Reservists Comm. to Stop the War, 418 U. S. 208 (1974), the taxpayer-plaintiffs contended that the Incompatibility Clause of Article I prohibited Members of Congress from holding commissions in the Armed Forces Reserve. We held that these plaintiffs lacked standing under Flast because they “did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch in permitting Members of Congress to maintain their Reserve status.” 418 U. S., at 228. This was the case even though the plaintiffs sought to reclaim reservist pay received by those Members — pay that presumably was funded through Congress’ general appropriations for the support of the Armed Forces: “Such relief would follow from the invalidity of Executive action in paying persons who could not lawfully have been reservists, not from the invalidity of the statutes authorizing pay to those who lawfully were Reservists.” Ibid., n. 17. See also United States v. Richardson, 418 U. S. 166, 175 (1974) (denying taxpayers standing to compel publication of accounting for the Central Intelligence Agency because “there is no ‘logical nexus’ between the asserted status of taxpayer and the claimed failure of the Congress to require the Executive to supply a more detailed report of the expenditures of that agency”).
Bowen v. Kendrick, 487 U. S. 589 (1988), on which respondents rely heavily, is nbt to the contrary. In that case, we held that the taxpayer-plaintiffs had standing to mount an as-applied challenge to the Adolescent Family Life Act (AFLA), which authorized federal grants to private community service groups including religious organizations. The Court found “a sufficient nexus between the taxpayer’s standing as a taxpayer and the congressional exercise of taxing and spending power,” notwithstanding the fact that “the funding authorized by Congress ha[d] flowed through *607 and been administered” by an Executive Branch official. Id., at 620, 619.
But the key to that conclusion was the Court’s recognition that AFLA was “at heart a program of disbursement of funds pursuant to Congress’ taxing and spending powers,” and that the plaintiffs’ claims “call[ed] into question how the funds authorized by Congress [were] being disbursed pursuant to the AFLA’s statutory mandate.” Id., at 619-620 (emphasis added). AFLA not only expressly authorized and appropriated specific funds for grantmaking, it also expressly contemplated that some of those moneys might go to projects involving religious groups. See id., at 595-596; see also id., at 623 (O’Connor, J., concurring) (noting the “partnership between governmental and religious institutions contemplated by the AFLA”).[6] Unlike this case, Kendrick involved a “program of disbursement of funds pursuant to Congress’ taxing and spending powers” that “Congress had created,” “authorized,” and “mandate[d].” Id., at 619-620.
Respondents attempt to paint their lawsuit as a Kendrick-style as-applied challenge, but this effort is unavailing for the simple reason that they can cite no statute whose application they challenge. The best they can do is to point to unspecified, lump-sum “Congressional budget appropriations” for the general use of the Executive Branch— the allocation of which “is a[n] administrative decision *608 traditionally regarded as committed to agency discretion.” Lincoln v. Vigil, 508 U. S. 182, 192 (1993). Characterizing this case as an “as-applied challenge” to these general appropriations statutes would stretch the meaning of that term past its breaking point. It cannot be that every legal challenge to a discretionary Executive Branch action implicates the constitutionality of the underlying congressional appropriation. When a criminal defendant charges that a federal agent carried out an unreasonable search or seizure, we do not view that claim as an as-applied challenge to the constitutionality of the statute appropriating funds for the Federal Bureau of Investigation. Respondents have not established why the discretionary Executive Branch expenditures here, which are similarly funded by no-strings, lump-sum appropriations, should be viewed any differently.[7]
In short, this case falls outside “the narrow exception” that Flast “created to the general rule against taxpayer standing established in Frothingham.” Kendrick, supra, at 618. Because the expenditures that respondents challenge were not expressly authorized or mandated by any specific congressional enactment, respondents’ lawsuit is not directed at an exercise of congressional power, see Valley Forge, 454 U. S., at 479, and thus lacks the requisite “logical nexus” be *609 tween taxpayer status “and the type of legislative enactment attacked,” Flast, 392 U. S., at 102.
IV
A
1
Respondents argue that it is “arbitrary” to distinguish between money spent pursuant to congressional mandate and expenditures made in the course of executive discretion, because “the injury to taxpayers in both situations is the very injury targeted by the Establishment Clause and Flast — the expenditure for the support of religion of funds exacted from taxpayers.” Brief for Respondents 13. The panel majority below agreed, based on its observation that “there is so much that executive officials could do to promote religion in ways forbidden by the establishment clause.” 433 F. 3d, at 995.
But Flast focused on congressional action, and we must decline this invitation to extend its holding to encompass discretionary Executive Branch expenditures. Flast itself distinguished the “incidental expenditure of tax funds in the administration of an essentially regulatory statute,” 392 U. S., at 102, and we have subsequently rejected the view that taxpayer standing “extends to ‘the Government as a whole, regardless of which branch is at work in a particular instance,’ ” Valley Forge, supra, at 484, n. 20. Moreover, we have repeatedly emphasized that the Flast exception has a “narrow application in our precedent,” Cuno, 547 U. S., at 348, that only “slightly lowered” the bar on taxpayer standing, Richardson, 418 U. S., at 173, and that must be applied with “rigor,” Valley Forge, supra, at 481.
It is significant that, in the four decades since its creation, the Flast exception has largely been confined to its facts. We have declined to lower the taxpayer standing bar in suits alleging violations of any constitutional provision apart from the Establishment Clause. See Tilton v. Richardson, 403 U. S. 672 (1971) (no taxpayer standing to sue under Free Ex *610 ercise Clause of First Amendment); Richardson, 418 U. S., at 175 (no taxpayer standing to sue under Statement and Account Clause of Art. I); Schlesinger, 418 U. S., at 228 (no taxpayer standing to sue under Incompatibility Clause of Art. I); Cuno, supra, at 349 (no taxpayer standing to sue under Commerce Clause). We have similarly refused to extend Flast to permit taxpayer standing for Establishment Clause challenges that do not implicate Congress’ taxing and spending power. See Valley Forge, supra, at 479-482 (no taxpayer standing to challenge Executive Branch action taken pursuant to Property Clause of Art. IV); see also District of Columbia Common Cause v. District of Columbia, 858 F. 2d 1, 3-4 (CADC 1988); In re United States Catholic Conference, 885 F. 2d 1020, 1028 (CA2 1989). In effect, we have adopted the position set forth by Justice Powell in his concurrence in Richardson and have “limit[ed] the expansion of federal taxpayer and citizen standing in the absence of specific statutory authorization to an outer boundary drawn by the results in Flast....” 418 U. S., at 196.
2
While respondents argue that Executive Branch expenditures in support of religion are no different from legislative extractions, Flast itself rejected this equivalence: "It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute.” 392 U. S., at 102.
Because almost all Executive Branch activity is ultimately funded by some congressional appropriation, extending the Flast exception to purely executive expenditures would effectively subject every federal action — be it a conference, proclamation, or speech — to Establishment Clause challenge by any taxpayer in federal court. To see the wide swathe of activity that respondents’ proposed rule would cover, one need look no further than the amended complaint in this action, which focuses largely on speeches and presentations *611 made by Executive Branch officials. See, e. g., Amended Complaint ¶ 32, App. to Pet. for Cert. 73a (challenging Executive Branch officials’ “support of national and regional conferences”); id., ¶ 33, App. to Pet. for Cert. 73a-75a (challenging content of speech by Secretary of Education); id., ¶¶ 35, 36, App. to Pet. for Cert. 76a (challenging content of Presidential speeches); id., ¶ 41, App. to Pet. for Cert. 77a (challenging Executive Branch officials’ “public appearances” and “speeches”). Such a broad reading would ignore the first prong of Flast’s standing test, which requires “a logical link between [taxpayer] status and the type of legislative enactment attacked.” 392 U. S., at 102.
It would also raise serious separation-of-powers concerns. As we have recognized, Flast itself gave too little weight to these concerns. By framing the standing question solely in terms of whether the dispute would be presented in an adversary context and in a form traditionally viewed as capable of judicial resolution, Flast “failed to recognize that this doctrine has a separation-of-powers component, which keeps courts within certain traditional bounds vis-á-vis the other branches, concrete adverseness or not.” Lewis v. Casey, 518 U. S. 343, 353, n. 3 (1996); see also Valley Forge, 454 U. S., at 471. Respondents’ position, if adopted, would repeat and compound this mistake.
The constitutional requirements for federal-court jurisdiction — including the standing requirements and Article III— “are an essential ingredient of separation and equilibration of powers.” Steel Co. v. Citizens for Better Environment, 523 U. S. 83, 101 (1998). “Relaxation of standing requirements is directly related to the expansion of judicial power,” and lowering the taxpayer standing bar to permit challenges of purely executive actions “would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government.” Richardson, supra, at 188 (Powell, J., concurring). The rule respondents propose would enlist the federal courts to superintend, at the behest *612 of any federal taxpayer, the speeches, statements, and myriad daily activities of the President, his staff, and other Executive Branch officials. This would “be quite at odds with ... Fias?s own promise that it would not transform federal courts into forums for taxpayers’ ‘generalized grievances’” about the conduct of government, Cuno, 547 U. S., at 348 (quoting Flast, supra, at 106), and would “open the Judiciary to an arguable charge of providing ‘government by injunction,’ ” Schlesinger, supra, at 222. It would deputize federal courts as “ ‘virtually continuing monitors of the wisdom and soundness of Executive action,’” and that, most emphatically, “ ‘is not the role of the judiciary.’ ” Allen, 468 U. S., at 760 (quoting Laird v. Tatum, 408 U. S. 1, 15 (1972)).
3
Both the Court of Appeals and respondents implicitly recognize that unqualified federal taxpayer standing to assert Establishment Clause claims would go too far, but neither the Court of Appeals nor respondents has identified a workable limitation. The Court of Appeals, as noted, conceded only that a taxpayer would lack standing where “the marginal or incremental cost to the taxpaying public of the alleged violation of the establishment clause” is “zero.” 433 F. 3d, at 995. Applying this rule, the Court of Appeals opined that a taxpayer would not have standing to challenge a President’s favorable reference to religion in a State of the Union address because the costs associated with the speech “would be no greater merely because the President had mentioned Moses rather than John Stuart Mill.” Ibid.
There is reason to question whether the Court of Appeals intended for its zero-marginal-cost test to be taken literally, because the court, without any apparent inquiry into the costs of Secretary Paige’s speech, went on to agree that the plaintiffs lacked standing to challenge that speech. Id., at 996. But if we take the Court of Appeals’ test literally— i. e., that any marginal cost greater than zero suffices — tax *613 payers might well have standing to challenge some (and perhaps many) speeches. As Judge Easterbrook observed: “The total cost of presidential proclamations and speeches by Cabinet officers that touch on religion (Thanksgiving and several other holidays) surely exceeds $500,000 annually; it may cost that much to use Air Force One and send a Secret Service detail to a single speaking engagement.” 447 F. 3d, at 989-990 (concurring in denial of rehearing en banc). At a minimum, the Court of Appeals’ approach (asking whether the marginal cost exceeded zero) would surely create difficult and uncomfortable line-drawing problems. Suppose that it is alleged that a speechwriter or other staff member spent extra time doing research for the purpose of including “religious imagery” in a speech. Suppose that a President or a Cabinet officer attends or speaks at a prayer breakfast and that the time spent was time that would have otherwise been spent on secular work.
Respondents take a somewhat different approach, contending that their proposed expansion of Flast would be manageable because they would require that a challenged expenditure be “fairly traceable to the conduct alleged to violate the Establishment Clause.” Brief for Respondents 17. Applying this test, they argue, would “scree[n] out. .. challenge^ to] the content of one particular speech, for example the State of the Union address, as an Establishment Clause violation.” Id., at 21.
We find little comfort in this vague and ill-defined test. As an initial matter, respondents fail to explain why the (often substantial) costs that attend, for example, a Presidential address are any less “traceable” than the expenses related to the Executive Branch statements and conferences at issue here. Indeed, respondents concede that even lawsuits involving de minimis amounts of taxpayer money can pass their proposed “traceability” test. Id., at 20, n. 6.
Moreover, the “traceability” inquiry, depending on how it is framed, would appear to prove either too little or too *614 much. If the question is whether an allegedly unconstitutional executive action can somehow be traced to taxpayer funds in general, the answer will always be yes: Almost all Executive Branch activities are ultimately funded by some congressional appropriation, whether general or specific, which is in turn financed by tax receipts. If, on the other hand, the question is whether the challenged action can be traced to the contributions of a particular taxpayer-plaintiff, the answer will almost always be no: As we recognized in Frothinglmm, the interest of any individual taxpayer in a particular federal expenditure “is comparatively minute and indeterminable . . . and constantly changing.” 262 U. S., at 487.
B
Respondents set out a parade of horribles that they claim could occur if Flast is not extended to discretionary Executive Branch expenditures. For example, they say, a federal agency could use its discretionary funds to build a house of worship or to hire clergy of one denomination and send them out to spread their faith. Or an agency could use its funds to make bulk purchases of Stars of David, crucifixes, or depictions of the star and crescent for use in its offices or for distribution to the employees or the general public. Of course, none of these things has happened, even though Flast has not previously been expanded in the way that respondents urge. In the unlikely event that any of these executive actions did take place, Congress could quickly step in. And respondents make no effort to show that these improbable abuses could not be challenged in federal court by plaintiffs who would possess standing based on grounds other than taxpayer standing.
C
Over the years, Flast has been defended by some and criticized by others. But the present case does not require us to reconsider that precedent. The Court of Appeals did not *615 apply Flast; it extended Flast. It is a necessary concomitant of the doctrine of stare decisis that a precedent is not always expanded to the limit of its logic. That was the approach that then-Justice Rehnquist took in his opinion for the Court in Valley Forge, and it is the approach we take here. We do not extend Flast, but we also do not overrule it. We leave Flast as we found it.
Justice Scalia says that we must either overrule Flast or extend it to the limits of its logic. His position is not “[in]sane,” inconsistent with the “rule of law,” or “utterly meaningless.” Post, at 618 (opinion concurring in judgment). But it is wrong. Justice Scalia does not seriously dispute either (1) that Flast itself spoke in terms of “legislative enaetment[s]” and “exercises of congressional power,” 392 U. S., at 102, or (2) that in the four decades since Flast was decided, we have never extended its narrow exception to a . purely discretionary Executive Branch expenditure. We need go no further to decide this case. Relying on the provision of the Constitution that limits our role to resolving the “Cases” and “Controversies” before us, we decide only the case at hand.
* * *
For these reasons, the judgment of the Court of Appeals for the Seventh Circuit is reversed.

It is so ordered.

 See, e. g., Exec. Order No. 13198,3 CFR 750 (2001 Comp.); Exec. Order No. 13280, 3 CFR 262 (2002 Comp.); Exec. Order No. 13342, 3 CFR 180 (2004 Comp.); Exec. Order No. 13397, 71 Fed. Reg. 12275 (2006).

 See also DaimlerChrysler Corp. v. Corp. 547 U. S. 332, 344 (2006) (“Standing has been rejected” where “the alleged injury is not ‘concrete and particularized,’. . . but instead a grievance the taxpayer ‘suffers in some indefinite way in common with people generally’ ” (quoting Defenders of Wildlife, 504 U. S., at 560, and Frothingham v. Mellon, decided with Massachusetts v. Mellon, 262 U. S. 447, 488 (1923))); ASARCO Inc. v. Kadish, 490 U. S. 605, 616 (1989) (opinion of Kennedy, J.) (“[Gjeneralized grievances brought by concerned citizens . . . are not cognizable in the federal courts”); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464, 483 (1982) (“[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. Ill”); United States v. Richardson, 418 U. S. 166, 174 (1974) (“[A] taxpayer may not ‘employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System’ ” (quoting Flast v. Cohen, 392 U. S. 83, 114 (1968) (Stewart, J., concurring); some internal quotation marks omitted)); Schlesinger v. Reservists Comm. to Stop the War, 418 U. S. 208, 217 (1974) (“Respondents seek to have the Judicial Branch compel the Executive Branch to act in conformity with the Incompatibility Clause [of the Constitution], an interest shared by all citizens. . . . And that claimed nonobservance, standing alone, would adversely affect only the generalized interest-of all citizens in constitutional governance, and that is an abstract injury”); Frothingham, supra, at 488 (“The party who invokes the power [of judicial review] must be able to show not only that *602 the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally”).

 At around the time the Act was passed and Flast was decided, the great majority of nonpublic elementary and secondary schools in the United States were associated with a church. In 1965-1966, for example, 91.1 percent of all nonpublic elementary schools and 78.2 percent of all nonpublic secondary schools in the United States were religiously affiliated. Dept, of Health, Education, and Welfare, Statistics of Nonpublic Elementary and Secondary Schools 1965-66, p. 7 (1968). Congress surely understood that much of the aid mandated by the statute would find its way to religious schools.

 See, e. g., 119 Stat. 2472 (appropriating $53,830,000 “to be available for allocation within the Executive Office of the President”).

 Valley Forge also relied on a second rationale: that the authorizing Act was an exercise of Congress’ power under the Property Clause of Art. IV, §3, cl. 2, and not the Taxing and Spending Clause of Art. I, §8. 454 U. S., *606 at 480. But this conclusion merely provided an additional — “and perhaps redundanft],” ibid. — basis for denying a claim of standing that was already foreclosed because it was not based on any congressional action.

 For example, the statute noted that the problems of adolescent premarital sex and pregnancy “are best approached through a variety of integrated and essential services provided to adolescents and their families” by “religious and charitable organizations,” among other groups. 42 U. S. C. § 300z(a)(8)(B) (1982 ed.). It went on to mandate that federally provided services in that area should “emphasize the provision of support by other family members, religious and charitable organizations, voluntary associations, and other groups.” §300z(a)(10)(C). And it directed that demonstration projects funded by the government “shall... make use of support systems” such as religious organizations, §300z-2(a), and required grant applicants to describe how they would “involve religious and charitable organizations” in their projects, §300z-5(a)(21)(B).

 Nor is it relevant that Congress may have informally “earmarked” portions of its general Executive Branch appropriations to fund the offices and centers whose expenditures are at issue here. See, e. g., H. R. Rep. No. 107-342, p. 108 (2001). “[A] fundamental principle of appropriations law is that where ‘Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on’ the agency.” Lincoln, 508 U. S., at 192 (quoting In re LTV Aerospace Corp., 55 Comp. Gen. 307, 319 (1975)); see also TVA v. Hill, 437 U. S. 153, 191 (1978) (“Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress”).