**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-2082

KAY DIANE ANSLEY; CATHERINE MCGAUGHEY; CAROL ANN PERSON; THOMAS ROGER PERSON; KELLEY PENN; SONJA GOODMAN,

Plaintiffs - Appellants,

v.

MARION WARREN, in his Official Capacity as Director of the North Carolina Administrative Office of the Courts,

Defendant - Appellee.

------------------------------------------------------

NORTH CAROLINA VALUES COALITION; THOMAS MORE LAW CENTER; BRENDA BUMGARNER; CHRISTIAN LEGAL SOCIETY; NATIONAL ASSOCIATION OF EVANGELICALS,

Amici Supporting Appellee.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Max O. Cogburn, Jr., District Judge. (1:16-cv-00054-MOC-DLH)

Argued: May 10, 2017                    Decided: June 28, 2017

Before WILKINSON, KEENAN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Keenan and Judge Thacker joined.

---

**ARGUED:** S. Luke Largess, TIN FULTON WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellants. Olga Eugenia Vysotskaya de Brito, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Jacob H. Sussman, John W. Gresham, Cheyenne N. Chambers, TIN FULTON WALKER & OWEN, PLLC, Charlotte, North Carolina; Meghann K. Burke, BRAZIL & BURKE, P.A., Asheville, North Carolina; Crystal M. Richardson, LAW OFFICE OF CRYSTAL M. RICHARDSON, Charlotte, North Carolina, for Appellants. Josh Stein, North Carolina Attorney General, Amar Majmundar, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. Deborah J. Dewart, Swansboro, North Carolina, for Amicus North Carolina Values Coalition. Richard Thompson, Kate Oliveri, THOMAS MORE LAW CENTER, Ann Arbor, Michigan; B. Tyler Brooks, MILLBERG GORDON STEWART PLLC, Raleigh, North Carolina, for Amicus Thomas More Law Center. Mary E. McAlister, Lynchburg, Virginia, Mathew D. Staver, Anita L. Staver, Horatio G. Mihet, LIBERTY COUNSEL, Orlando, Florida, for Amicus Brenda Bumgarner. Kimberlee Wood Colby, CENTER FOR LAW & RELIGIOUS FREEDOM, Springfield, Virginia, for Amici Christian Legal Society and National Association of Evangelicals.

---

WILKINSON, Circuit Judge:

Three couples assert that North Carolina's Senate Bill 2 ("S.B. 2"), which allows state magistrates to recuse themselves from performing marriages on account of a religious objection, violates the Establishment Clause. But the plaintiffs, all of whom are either married or engaged, do not claim that the state has impeded their right to get married. Instead, they challenge the religious exemption as taxpayers who object to the alleged spending of public funds in aid of religion. In light of the Supreme Court's admonitions on the narrow scope of taxpayer standing, we affirm the judgment of the district court that plaintiffs lack standing to press this claim.

I.

At the heart of this lawsuit is a debate over the extent to which religious accommodations can coexist with the constitutional right to same-sex marriage. In 2012, the citizens of North Carolina voted to amend their state constitution to limit the definition of marriage to heterosexual couples. Two years later, a federal district court ruled that the restriction against same-sex marriage violated the Fourteenth Amendment. *See Gen. Synod of the United Church of Christ v. Resinger*, 12 F. Supp. 3d 790 (W.D.N.C. 2014). The director of the North Carolina Administrative Office of the Courts ("NCAOC") instructed state magistrates to begin conducting marriage ceremonies for all couples presenting a valid marriage license. Under North Carolina law at the time, any magistrate who refused "to discharge any of the duties of his office" could be removed from office and face misdemeanor charges. *See* N.C. Gen. Stat. § 14-230.

3

The North Carolina legislature quickly responded. On January 28, 2015, the President Pro Tempore of the Senate filed S.B. 2. Section 1 of the bill granted magistrates and registers of deeds the right to declare "any sincerely held religious objection" to performing certain kinds of marriages, after which they would be recused from participating in any marriages for a six-month period. If all of the officials in a county recused themselves, the NCAOC would arrange to bring a willing magistrate from another county to conduct marriages. Sections 2 and 3 revised the General Statutes to remove any offenses related to an official's recusal from a marriage ceremony. Section 4 recast the magistrates' individual duty to perform marriages as a collective responsibility and set a minimum requirement that magistrates remain available to conduct marriages at least ten hours per week. Finally, Section 5 provided that any magistrate who resigned and was subsequently rehired within ninety days of the effective date of S.B. 2 would receive full retirement service credit for the gap in service.

The House of Representatives approved the bill on May 28, 2015. Governor McCrory vetoed it the same day. Undaunted, the legislature overrode the Governor's veto on June 11, 2015 and S.B. 2 became law.

Plaintiffs brought this § 1983 action against the current director of the NCAOC, asserting that S.B. 2 violates the Establishment Clause by authorizing the spending of public funds in aid of religion. In particular, plaintiffs challenge two sets of expenditures. First, they allege that since the passage of S.B. 2, all of the magistrates in McDowell County have recused themselves from performing marriages. In the course of carrying out these religious exemptions, Section 1 directs the NCAOC to expend public funds

4

transporting magistrates from Rutherford County to perform marriages in McDowell County and transporting magistrates from McDowell County to perform other judicial duties in Rutherford County. Second, Section 5 directs the NCAOC to make a one-time payment into the state retirement system on behalf of each reappointed magistrate.

The district court held that plaintiffs lacked taxpayer standing and dismissed the claim. Because the expenditures contemplated by S.B. 2 to administer the recusals were merely incidental, the court concluded that their suit did not fall within the narrow confines of *Flast v. Cohen*, 392 U.S. 83 (1968). This appeal followed.

II.

Article III of the Constitution limits the federal judicial power to the resolution of "Cases" or "Controversies." An essential element of this bedrock principle is that any party who invokes the court's authority must establish standing. *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011). To demonstrate standing, a plaintiff must prove that he has suffered a "concrete and particularized" injury that is "fairly traceable to the challenged conduct of the defendant" and is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). In other words, a party's "keen interest in the issue" is insufficient by itself to meet Article III's requirements. *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2659 (2013). "[C]oncerned bystanders" may not marshal the judiciary as a "vehicle for the vindication of value interests"—the exercise of judicial power is restricted to litigants who seek to rectify a personal and discrete harm. *Id.* at 2663 (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)).

The concept of standing finds its roots in the "idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984). By confirming that the legal questions presented to the court are resolved "in a concrete factual context" rather than "in the rarefied atmosphere of a debating society," *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982), the doctrine ensures that "we act *as judges*, and do not engage in policymaking properly left to elected representatives," *Hollingsworth*, 133 S. Ct. at 2659. After all, the federal courts "are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution." *Hein v. Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) (plurality opinion). "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws)" is the function of the state and federal political branches. *Lujan*, 504 U.S. at 576; *see also United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring) ("The public confidence essential to the [judiciary] and the vitality critical to the [representative branches] may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches.").

These basic axioms outlining the proper role of the judiciary guide our approach to plaintiffs' claim.

III.

Although the concept of injury is often "elusive" in Establishment Clause claims, *see Suhre v. Haywood County*, 131 F.3d 1083, 1085 (4th Cir. 1997) (quoting *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991)), in the classic case a challenger

6

demonstrates standing by alleging a distinct personal harm. One line of cases grants standing based on the particularized injury that is caused by "unwelcome" contact with state-sponsored "religious exercises," such as mandatory prayer in a public school classroom. *See Valley Forge*, 454 U.S. at 486 n.22 (citing *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203 (1963)). Another set of decisions recognizes standing if a law or practice "disadvantages a particular religious group or particular nonreligious group," *Winn*, 563 U.S. at 145, such as when the state imposes more onerous regulatory requirements on certain religious faiths, *see Larson v. Valente*, 456 U.S. 228 (1982).

These sorts of familiar Establishment Clause injuries are not present here. Plaintiffs concede that the state has not impeded or restricted their opportunity to get married. One same-sex couple married in 2014, another same-sex couple is engaged to be married, and the last pair of plaintiffs, an interracial couple, married in 1976. Nonetheless, they contend that their status as North Carolina taxpayers affords them standing to challenge S.B. 2. Because plaintiffs' claim does not fall within the narrow exception to the general bar against taxpayer standing, their suit must be dismissed.

The Supreme Court has repeatedly held that a taxpayer's interest in ensuring that collected funds are spent in accordance with the Constitution is "too generalized and attenuated" to confer Article III standing. *Hein*, 551 U.S. at 599. This precept was first announced in *Frothingham v. Mellon*, 262 U.S. 447 (1923), where the Court rejected a federal taxpayer's argument that she had standing by virtue of her personal tax liability to challenge the constitutionality of the Maternity Act of 1921. The "effect upon future

7

taxation," the Court reasoned, is too "remote, fluctuating and uncertain" to give rise to the kind of redressable personal injury required under Article III. *Id.* at 487. And the plaintiff's "interest in the moneys of the treasury" is not a particularized interest but one "shared with millions of others." *Id.* Accordingly, *Frothingham* concluded that the "administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers . . . is essentially a matter of public and not of individual concern." *Id.*; *see also Doremus v. Bd. of Educ.*, 342 U.S. 429, 433–34 (1952).

In *Flast v. Cohen*, however, the Supreme Court carved out a narrow exception to the general rule against taxpayer standing, holding that federal taxpayers have standing to bring an Establishment Clause challenge to a congressional statute that distributed federal funds to parochial schools. The Court explained that taxpayers have standing when two conditions are met. First, there must be a "logical link" between the plaintiff's taxpayer status and the "type of legislative enactment attacked." *Flast*, 392 U.S. at 102. Plaintiffs must allege more than "an incidental expenditure of tax funds in the administration of an essentially regulatory statute." *Id.* They instead need to challenge legislation passed under the taxing and spending power—those expenditures "funded by a specific congressional appropriation" and disbursed pursuant to "a direct and unambiguous congressional mandate." *Hein*, 551 U.S. at 604. Second, there must be a "nexus" between the plaintiff's taxpayer status and the "precise nature of the constitutional infringement being alleged." *Flast*, 392 U.S. at 102. Under this requirement, the taxpayer must show that "his tax money is being extracted and spent in violation of specific constitutional protections." *Id.* at 106. Taken together, the plaintiffs in *Flast* met both conditions based on the allegation

8

that federal funds had been "transferred through the Government's Treasury to a sectarian entity" in violation of the Establishment Clause. *Winn*, 563 U.S. at 139–40; *see also Flast*, 392 U.S. at 105–06.

In recent decades the Supreme Court came to recognize that *Flast* "gave too little weight" to the "separation-of-powers concerns" underlying standing. *Hein*, 551 U.S. at 611. The Court issued a steady drumbeat of decisions emphasizing the narrow contours of the taxpayer exception. The Court has made clear that "*Flast* turned on the unique features of Establishment Clause violations," *Winn* 563 U.S. at 139, and has refused to extend the exception to suits alleging breaches of any other constitutional provision, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) (Commerce Clause); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) (Incompatibility Clause); *Richardson*, 418 U.S. 166 (Statement and Account Clause). And the Court has likewise declined to expand taxpayer standing to challenges that do not involve specific legislative appropriations under the taxing and spending power. *See Winn*, 563 U.S. 125 (no taxpayer standing to challenge tax credits or other "tax expenditures"); *Hein*, 551 U.S. 587 (no taxpayer standing to challenge federal executive actions financed by general appropriations); *Valley Forge*, 454 U.S. 464 (no taxpayer standing to challenge an agency's decision to transfer a tract of property pursuant to the Property Clause).

Given that the Supreme Court has expressly upheld taxpayer standing on just two occasions, *see Flast*, 392 U.S. 83; *Bowen v. Kendrick*, 487 U.S. 589 (1988), the application of the doctrine has been narrowly circumscribed. Tellingly, plaintiffs' brief largely relies upon cases where taxpayer standing has *not* been found. Although *Flast* has

9

not been explicitly overturned, "[i]t is significant that, in the four decades since its creation, [the exception] has largely been confined to its facts." *Hein*, 551 U.S. at 609. Effectively, the Court has restricted the "expansion of federal taxpayer and citizen standing in the absence of specific statutory authorization to an outer boundary drawn by the results in *Flast*." *Id.* at 610 (emphasis omitted).

Finally, the Court's skepticism of federal taxpayer standing "applies with undiminished force" to claims by state taxpayers such as the plaintiffs here. *Cuno*, 547 U.S. at 345; *see also Winn*, 563 U.S. at 138–40 (holding state taxpayers to the same requirements under *Flast*). Indeed, the Court has noted that relaxing the bar against taxpayer standing for state taxpayers would raise serious federalism concerns and "interpose the federal courts as virtually continuing monitors of the wisdom and soundness of state fiscal administration." *Cuno*, 547 U.S. at 346. In short, courts must be mindful in state taxpayer standing cases of the "modest role Article III envisions for federal courts," *id.*, and rigorously adhere to the principles of federalism and separation-of-powers that inform taxpayer standing controversies generally.

IV.

A.

Plaintiffs begin by asserting that they have set forth the necessary link between their taxpayer status and the challenged sections of S.B. 2. In particular, they contend that two provisions of S.B. 2 require the NCAOC to spend tax dollars on behalf of recused magistrates—first, to transport a "willing" magistrate to perform marriages in McDowell County and, second, to make a one-time payment into the state retirement system for

10

each reappointed official. In their view, these authorized expenditures facilitating a magistrate's religious objection amount to the "extract[ion] and spen[ding] of 'tax money' in aid of religion." Appellants' Br. at 14 (quoting *Winn*, 563 U.S. at 140).

Plaintiffs' view is incorrect. *Flast* limited taxpayer standing to challenges directed at legislative exercises of the taxing and spending power. Under the first nexus requirement, a plaintiff must challenge expenditures "funded by a specific congressional appropriation" and "undertaken pursuant to an express congressional mandate." *Hein*, 551 U.S. at 604. Here, the link between legislative action and the expenditures in S.B. 2 is attenuated. There is some token amount of funds disbursed for travel expenses and retirement contributions, but plaintiffs cannot point to any specific appropriation by the legislature to implement the recusal scheme. *See Hinrichs v. Speaker of the House of Representatives of the Indiana General Assembly*, 506 F.3d 584, 599 n.8 (7th Cir. 2007) ("[T]here is no specific appropriation either for Rule 10.2 or for the Minister of the Day program. Absent such an appropriation, the necessary link . . . has not been established."). Plaintiffs seek to characterize these expenditures as the "lifeblood" of the statute, Appellants' Reply Br. at 8, but the inescapable fact is that S.B. 2 is not a spending bill. What we have instead are "incidental expenditure[s] of tax funds in the administration of an essentially regulatory statute" that alters the scope of magistrate duties in performing marriages. *Flast*, 392 U.S. at 102. As with any regulatory measure, some level of expenditure is necessary to carry out the goals of the program, and the Supreme Court has never found such ancillary spending to provide an adequate basis for standing.

11

At best, plaintiffs can point to the legislature's enactment of S.B. 2 and its passing of a budget to support the general operations of the state judiciary. But the Supreme Court has admonished that taxpayer standing does not "extend[] to 'the Government as a whole, regardless of which branch is at work in a particular instance.'" *Valley Forge*, 454 U.S. at 484 n.20. Government as a whole requires money to function, but that is not enough. In *Valley Forge*, therefore, the Court held that a group of taxpayers did not have standing to challenge a property transfer by an executive agency. Even though the transfer was "arguably authorized" by federal statute, the *Flast* exception did not apply because "the source of their complaint [was] not a congressional action, but a decision by [the executive branch]." *Id.* at 479 & n.15. The same principle applies to S.B. 2, which implicitly authorizes spending by an administrative agency of the judicial branch. Once again, plaintiffs have not shown that the *legislature* extracted tax dollars to support the allegedly unconstitutional practice.

*Bowen v. Kendrick* supports our conclusion. There, the Supreme Court permitted a group of federal taxpayers to challenge the Adolescent Family Life Act (AFLA), a statute appropriating funds for community service organizations and various religious groups. *Kendrick*, 487 U.S. at 596–97. Notwithstanding the fact that "the funding authorized by Congress ha[d] flowed through and been administered" by an executive official, the Court found that the program was an exercise of Congress's taxing and spending power. *Id.* at 619–20. But the "key" to *Kendrick*'s conclusion, as the Court subsequently explained, was that the statute was "at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers" and that plaintiffs objected to "how the funds

12

authorized by Congress [were] being disbursed *pursuant to the AFLA's statutory mandate.*" *Hein*, 551 U.S. at 607 (quoting *Kendrick*, 487 U.S. at 619–20). Similar as-applied challenges to executive (or judicial) branch disbursements could be raised only where the congressional statute "appropriated specific funds for grantmaking" and "expressly contemplated that some of those moneys might go to projects involving religious groups." *Id.*

Plaintiffs' attempt to cast S.B. 2 in a similar light is unavailing. Simply put, S.B. 2 is not a "program of disbursement of funds." *Id.* Rather, the underlying taxing and spending action is one layer removed: Any expenditures that the NCAOC makes pursuant to S.B. 2 are "funded by no-strings, lump-sum appropriations" to the judicial branch. *Id.* at 608. Accordingly, *Kendrick* is inapposite. Unlike the challenged legislative appropriations in *Kendrick*, which expressly contemplated that funds might be disbursed for religious purposes, the general lump-sum appropriations to the NCAOC "did not expressly authorize, direct, or even mention the expenditures" challenged here. *Id.* at 605.

In sum, the challenged provisions of S.B. 2 are too far detached from legislative taxing and spending to establish the requisite "logical link" under *Flast*. 392 U.S. at 102. The NCAOC's alleged expenditures to administer the recusal scheme are incidental to a regulatory goal, and the legislature did not appropriate money from taxpayers for the express purpose of supporting magistrate recusals. At most, plaintiffs allege some general "expenditure of government funds in violation of the Establishment Clause," which the Court has repeatedly rejected as inadequate. *Hein*, 551 U.S. at 603; *see also Valley Forge*, 454 U.S. at 484 n.20.

13

B.

Plaintiffs also contend that they have met the second nexus requirement under *Flast*, alleging that the travel expenditures and retirement contributions authorized by S.B. 2 amount to an establishment of religion. But just as an exercise of the legislative taxing and spending power is missing on the front end of the test, so too is a traditional Establishment Clause violation missing on the back end. Because plaintiffs' case fails to set forth the paradigmatic injury under *Flast*—the "extract[ion] and spen[ding] of 'tax money' in aid of religion"—their claim falters on the second prong as well. *Winn*, 563 U.S. at 140.

For starters, not one penny goes to a religious institution or sectarian entity under S.B. 2. Instead, any disbursement from the state coffers remains *inside the state government* to support the efficient operation of the recusal scheme. This public/private distinction is important. After all, the Supreme Court has couched the injury alleged in Establishment Clause challenges to government spending in terms of the compelled support of private sectarian entities. *See Hein*, 551 U.S. at 604 n.3, 607 (explaining that the legislatures in *Flast* and *Kendrick* "surely understood" or "expressly contemplated" that some of those moneys might go to projects involving religious groups"); *In re Navy Chaplaincy*, 534 F.3d 756, 762 n.3 (D.C. Cir. 2008) (noting that in "the only two Supreme Court cases upholding taxpayer standing, the statutes authorized disbursement of federal funds to outside entities"). Although many government activities—whether it be state-sponsored religious displays or legislative prayers—often present a distinct Establishment Clause harm, *see Suhre*, 131 F.3d at 1086, the bare fact of

14

intragovernmental spending on a matter of religion does not give rise to same injury as in *Flast*.

The *Winn* Court put an even finer point on the essence of the spending injury. In the course of distinguishing between a tax credit and an explicit disbursement, the Court underscored the gravity of subsidizing an outside religious institution. This sort of legislative appropriation, the Justices explained, "implicate[s] individual taxpayers in sectarian activities" and diverts a "conscientious dissenter's funds in service of an establishment." *Winn*, 563 U.S. at 142. Accordingly, an essential component of the harm alleged in a spending challenge is a direct religious subsidy. "[W]hat matters under *Flast* is whether sectarian [entities] receive government funds drawn from general tax revenues, so that moneys have been extracted from a citizen and handed to a religious institution in violation of the citizen's conscience." *Id.* at 144.

Viewed in this light, plaintiffs have not alleged a classic spending injury under the Establishment Clause. The expenditures authorized by S.B. 2 are simply different from the sectarian subsidies at issue in *Flast* and *Kendrick*. When a government allocates money to facilitate a denominationally neutral recusal scheme and ensure that magistrates are available to perform marriages, any connection between the "dissenting taxpayer and alleged establishment" is to say the least remote. *Id.* at 142. Granting standing under these circumstances would stretch *Flast* beyond its articulated theory.

Furthermore, there is a salient incompatibility between the asserted basis for standing and the various Establishment Clause violations alleged on the merits. As we have noted, S.B. 2 is not an appropriations bill but an attempt to accommodate state

15

employees' rights of religious conscience with the right of same-sex couples to marry. *See Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970) (noting that "there is room for play in the joints" between the Religion Clauses and permissible space for the government to accommodate free exercise without offending the Establishment Clause). Plaintiffs' ultimate quarrel here is with the recusal, and hence the accommodation, rather than the reimbursement. In the course of framing their suit as a challenge to the incidental expenditures authorized by the statute, they launch a broadside against the accommodation as an improper advancement of "a religious view of marriage contrary to the [C]onstitution." Appellants' Br. at 15. Yet in so doing, plaintiffs misconceive the nature of a taxpayer standing suit. Under *Flast*'s second nexus requirement, taxpayers may not bootstrap their spending challenge into a larger attack on the validity of the accommodation itself. *See Doremus*, 342 U.S. at 434 ("It is apparent that the grievance which [plaintiffs] sought to litigate here is not a direct dollars-and-cents injury but is a religious difference."); *see also Cuno*, 547 U.S. at 348 (noting that *Flast* at most entitles a plaintiff to "an injunction against the spending").

Which, finally, brings us to the problem of redressability. It is not surprising that religious accommodations are seldom challenged on the basis of incidental government expenditures. A litigant's principal aim, as one would expect, is to invalidate the disputed accommodation. Yet under *Flast*, even if we were to agree that S.B. 2 unconstitutionally extracted and spent funds in aid of religion, we could not enjoin the judicial recusal program. The best remedy plaintiffs can hope for is an injunction against the ongoing travel expenditures, which if anything would have the unfortunate result of making

16

marriages less accessible. While an injunction against those expenditures might address some objections of conscience raised by plaintiffs, the basic incongruity between the available remedies under *Flast* and those sought by plaintiffs further undercuts the asserted nexus between their taxpayer status and the alleged Establishment Clause violation.

V.

The outcome here is in no way a comment on same-sex marriage as a matter of social policy. The case before us is far more technical—whether plaintiffs, simply by virtue of their status as state taxpayers, have alleged a personal, particularized injury for the purposes of Article III standing. Based on a century of Supreme Court precedent, we conclude that they have not.

As detailed above, this case presents one of the most problematic terrains for finding standing—either under general rules or the *Flast* exception. The classic conception of an injury-in-fact is missing. So too are essential ingredients of a *Flast* claim like a specific legislative appropriation and the subsidy of a sectarian entity.

Article III's case-or-controversy limitation ensures that federal courts respect "the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "In an era of frequent litigation, class actions, sweeping injunctions with prospective effect, and continuing jurisdiction to enforce judicial remedies, courts must be more careful to insist on the formal rules of standing, not less so." *Winn*, 563 U.S. at 146. This case is no exception.

17

The judgment is accordingly

*AFFIRMED.*