In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1292

FREEDOM FROM RELIGION FOUNDATION,
INCORPORATED, ANNE GAYLOR, ANNIE
L. GAYLOR, et al.,

*Plaintiffs-Appellants*,

*v.*

R. JAMES NICHOLSON, JONATHAN
PERLIN, HUGH MADDRY, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 06 C 212—**John C. Shabaz,** *Judge.*

ARGUED JANUARY 17, 2008—DECIDED AUGUST 5, 2008

Before RIPPLE, ROVNER and TINDER, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Plaintiffs, including Freedom From Religion Foundation, Inc. and three individual federal taxpayers (collectively, "Freedom From Religion"), commenced this civil rights action under 42 U.S.C. § 1983, alleging that the defendants, five high-level employees of the Department of Veterans Affairs (collectively, the "VA"), were violating the Establishment Clause. The

complaint sought both declaratory and injunctive relief. The district court granted the VA's motion for summary judgment. Freedom From Religion filed a timely appeal.

For the reasons set forth in this opinion, we vacate the judgment of the district court; the case is remanded to the district court with instructions to dismiss for lack of jurisdiction based on lack of taxpayer standing.

# I

# BACKGROUND

## A. The Department of Veterans Affairs and the Chaplain Service

The Department of Veterans Affairs (the "VA") is an executive agency, *see* 38 U.S.C. § 301(a), that traces its history to the Veterans Administration, an agency that President Herbert Hoover created by Executive Order.[1] The VA subsequently was elevated to cabinet-level status. *See* Department of Veterans Affairs Act, Pub. L. No. 100-527, 102 Stat. 2635 (Oct. 25, 1988). The Department is charged with the responsibility for, among other things, providing healthcare to the veterans of our armed forces as well as to their eligible family members and survivors. *See* 38 U.S.C. §§ 301(b), 1710, 7301(b). Congress created, within the organizational structure of the VA, the Veteran's Health Administration (the "VHA"); it mandated that the VHA "provide a complete medical and hospital service for the medical care and treatment of

---

[1] *See* Proclamation No. 4763, 45 Fed. Reg. 41,119 (June 16, 1980) (explaining that President Herbert Hoover established the Veterans Administration on July 21, 1930).

veterans," as provided for by other portions of Title 38. 38 U.S.C. § 7301(b).

The VA's healthcare system is extensive; it includes: 154 medical centers, with at least one in each state, Puerto Rico and Washington, D.C.; 875 ambulatory care and community-based outpatient clinics; 136 nursing homes; 43 residential rehabilitation treatment programs; 206 Veterans Centers; and 88 comprehensive home-care programs. In 2005, approximately 5.3 million people received care in a VA healthcare facility. The VA—following the lead of private healthcare providers, it claims—has adopted a holistic approach to health-care. Accordingly, it offers pastoral care, administered by VA chaplains, to veterans who receive VA healthcare.

Chaplains have a venerable history in the armed forces of our Republic. The Continental Army was first autho-rized to employ chaplains on July 29, 1775, when the Continental Congress authorized payment for a Con-tinental Chaplain;[2] shortly thereafter, General George Washington ordered that regimental chaplains be assigned.[3] After the adoption of the Constitution, the First Congress authorized the appointment of a com-missioned Army chaplain, Act of 1791, Ch. 28, § 5, 1 Stat. 222, and subsequent Congresses have increased the number of chaplains in the armed forces.[4]

---

[2] *Katcoff v. Marsh*, 755 F.2d 223, 225 (2d Cir. 1985) (citing II Cont. Cong. Jour. 220 (1975)).

[3] *Id.* (citing V The Writings of George Washington From The Original Manuscript Sources 244-45 (J. Fitzgerald ed. 1932)).

[4] *See, e.g.*, Act of October 6, 1917, ch. 94, 40 Stat. 394, 394; Act of May 20, 1862, ch. 80, § 2, 12 Stat. 403, 404; Act of March 2, 1849,

(continued...)

By the Civil War, the Army chaplains assisted in the provision of veterans' healthcare. On March 3, 1865, President Abraham Lincoln signed legislation establishing the National Home for Disabled Volunteer Soldiers.[5] The by-laws adopted by the board of managers[6] of the National Home created the position of chaplain, and the by-laws also directed that he "perform all the duties incident to his profession and position, administering to the spiritual wants and comforts of the members of the Branch to which he is appointed."[7] Nearly one hundred years later, on November 28, 1945, VA Administrator General Omar N. Bradley authorized the Director of Chaplains to station chaplains in all VA hospitals. R.20, Ex. 6, at 6.

Beginning in 1953, the Chaplain Service was organized as a professional care discipline under the Department of

---

[4]  (...continued)
ch. 83, § 3, 9 Stat. 351, 351; Act of February 11, 1847, ch. 8, § 7, 9 Stat. 123, 124; Act of January 11, 1812, ch. 14, § 24, 2 Stat. 671, 674; Act of April 12, 1808, ch. 43, § 7, 2 Stat. 481, 483.

[5]  *See, e.g.*, Act of May 20, 1862, ch. 80, § 2, 12 Stat. 403, 404 (authorizing the President to appoint a chaplain for each permanent hospital).

[6]  Among others appointed to constitute this public body were General Ulysses S. Grant, Admiral David G. Farragut, Vice-President Hannibal Hamlin, Chief Justice Salmon P. Chase, Secretary of War Edwin M. Stanton, General William Tecumseh Sherman, Henry Ward Beecher and, future Supreme Court Justice, Oliver Wendell Holmes.

[7]  R.22 (By-Laws of The National Home for Disabled Volunteer Soldiers, Articles II and XVII, *published in* Laws and Regulations, National Home for Disabled Volunteer Soldiers (1883)).

Medicine and Surgery within the VA. In 1962, Congress authorized the Secretary to "designate a member of the Chaplain Service of the Department as Director, Chaplain Service." *See* 38 U.S.C. § 7306(e)(1). That is the extent of congressional authorization for the VA's Chaplain Service. Recent relevant congressional appropriations bills neither appropriate funds expressly to be used in connection with the Chaplain Service nor require that the VA provide such services.[8]

## B. Aspects of the Chaplain Service Under Challenge

Freedom From Religion does not challenge the overall existence of the VA's Chaplain Service; rather, it objects to four specific aspects of the chaplaincy: (1) the clinical focus of the Chaplain Service; (2) the spiritual assessments that the VA gives to its patients; (3) the provision of pastoral care to VA outpatients; and (4) the integration of spirituality/religion into VA treatment programs.

According to Freedom From Religion, the historical focus of the Chaplain Service was sacramental in nature and involved caring for the seriously ill and dying patients, leading worship and administering the sacraments. In

---

[8] *See, e.g.*, Consolidated Appropriations Act, 2008, Div. I, Title II, Pub. L. No. 110-161, 121 Stat. 1844, 2262-74 (2007); Military Quality of Life and Veterans Affairs Appropriations Act, 2006, Title II, Pub. L. No. 109-114, 119 Stat. 2372, 2382-86 (2005) *amended by* Pub. L. No. 110-92, 21 Stat. 989 (2007); Consolidated Appropriations Act, 2005, Div. I, Title I, Pub. L. No. 108-447, 118 Stat. 2809, 3287-90 (2004); Consolidated Appropriations Act, 2004, Div. G, Title I, Pub. L. No. 108-199, 118 Stat. 3, 365-67 (2004).

the past ten years, however, the Chaplain Service has shifted to clinical, direct patient care—termed "pastoral care." The VA believes that the spiritual dimension of health must be integrated into all aspects of patient care, research and healthcare education. The Service has been reorganized to reflect this change, and current VA policy requires that the chaplaincy maintain a clinical focus. Under this reorganization, VA chaplains must be educated professionally in Clinical Pastoral Education ("CPE") and endorsed ecclesiastically by a particular faith tradition.

CPE, an interfaith professional education for ministry, teaches its students to help hospital patients as they deal with existential questions. According to the VA, a chaplain who employs CPE principles allows patients to direct the conversation and to identify both the patients' concerns and the available resources for dealing with their situations. CPE-trained chaplains avoid initiating or guiding religious instruction; however, they are trained to encourage helpful religious and spiritual coping processes.

It is undisputed that VA policy prohibits proselytizing. Indeed, the VA patients' bill of rights states that each VA patient has a right not to "be coerced into engaging in any religious activities against his or her desires." 38 C.F.R. § 17.33(b)(7). It is further undisputed that the provision of pastoral care is overtly religious in content only if the patient wishes; Freedom From Religion, nonetheless, disputes whether pastoral care can be completely non-religious.

According to the VA, pastoral care describes a relationship characterized by expressions of compassionate care, including "spiritual" counseling, guidance, con-

solation, empathetic listening and encouragement. The VA notes that the term "spiritual" refers not only to the practice of a philosophy, religion or way of living but also to "that which gives meaning and purpose to life." R.20, Ex. 2 at 1. Accordingly, chaplains have three main responsibilities to patients at every VA facility: ensuring that inpatients and outpatients receive appropriate clinical pastoral care; protecting each patient's constitutional right to free exercise of religion; and ensuring that patients do not have religion imposed upon them.

To facilitate the provision of pastoral care and to allow VA chaplains to tailor their services to specific patients, the VA conducts, what it terms, "spiritual assessments" to measure each patient's religious characteristics. The VA explains that these spiritual assessments also are required for accreditation by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), an independent, not-for-profit, nationally recognized organization that evaluates and accredits healthcare organizations and programs in the United States, including VA healthcare facilities. According to the JCAHO manual, "[s]pirtual assessment[s] should, at minimum, determine the patient's denomination, beliefs, and what spiritual practices are important to the patient." R.21 ¶ 11. The VA does not mandate any particular standard spiritual assessment. It has, however, collected examples of the various assessments that have been developed over the years, and it has made them available to VA chaplains to help them develop their own assessments. Despite the differences among the various spiritual assessments that are used by VA chaplains, Freedom From Religion asserts that all of the assessments emphasize formal religious belief systems and resources.

In the early 1990s, VA Chaplain Gary Berg, stationed at the VA Medical Center in St. Cloud, Minnesota, developed the Computer Assessment Program ("CAP"). CAP specifically was intended to help in understanding the role of religious faith in the maintenance of health, and it focuses on the alleged importance of assessing religious beliefs in order to make accurate religious diagnoses. To this end, CAP asks questions such as: (1) How often do you attend religious services during the year? (2) How much is religion (and/or God) a source of strength and comfort to you? (3) How often do you privately pray? (4) How often do you read the Bible or other religious literature? There is some dispute between the parties as to whether CAP is still used.[9] The parties, nevertheless, agree that many VA chaplains used CAP as a source for creating their own assessments.

The spiritual assessment recommended by the VA includes a scoring index whereby a "score on the Religious Resource Index of 15 or lower indicates that the patient should be referred to Chaplain Service." R.26, Ex. 17 at 4. Patients' religiosity or spirituality is measured using four categories: (1) Organized Religious Activity Scale; (2) Subjective Religious Scale; (3) Non-organized Religious Activity Scale; and (4) Spiritual Injury Scale.

Another example of a spiritual assessment is that of the VA Healthcare Network in Upstate New York. This

---

[9] The VA claims that VA computers no longer support CAP software as originally developed. Freedom From Religion, however, asserts that the VA Chaplain Center is still using CAP, now known as the "Living Water Computer Assessment Program," and that the Berg Spiritual Assessment Form is still being presented at VA Basic Chaplain Orientation Courses.

assessment explains that "[c]ompleting this assessment questionnaire will help us to better understand your spiritual care needs" and emphasizes that the VA "believe[s] that faith plays an important role in a person's sense of health and wellness." R.27, Ex. 23 at 1. The assessment also asks questions such as: (1) What is your religious preference? (2) How often do you attend church, synagogue, or other religious meetings? (3) Do you consider religious or spiritual beliefs systems to be important in your life? (4) Does your faith or beliefs influence the way you think about your health or the way you take care of yourself? (5) Would you like to receive any devotional materials while you are hospitalized? (6) Would you like to address any religious or spiritual issues with a chaplain?

The VA concedes that some VA assessments are very in-depth, but it asserts that the assessment will end if a patient indicates that he or she has no interest in receiving spiritual or pastoral care. Additionally, the VA distinguishes between two types of assessments that chaplains employ. The first type, which is given at intake, asks patients whether they identify with a particular faith group and whether there are any religious practices that they view as important to their health. The second type, a more in-depth assessment, is reserved for patients who indicate in the intake assessment that they are interested in receiving pastoral care.

The VA also uses spiritual assessments for outpatients, who comprise 80% of patients at some VA facilities. The VA offers pastoral care to outpatients regardless of whether outpatients' ability and opportunity to practice their religion are in any way burdened. The VA's goal is to provide pastoral care from a veteran's initial visit

that continues as he or she receives any VA medical services. According to the VA, research has shown that the result of giving outpatients access to quality spiritual and pastoral care is significant improvement in quality of life, reduced inpatient admissions and costs savings.

Freedom From Religion also challenges the treatment programs currently implemented at four separate VA facilities. Dayton VA Medical Center integrates the Lament and Fowler's Stages of Faith Development into the treatment of patients with post-traumatic stress disorder. Veterans are introduced to the Lament, which is addressed either to God or to a higher power, as a form of prayer. Sheridan VA Medical Center provides a drug and alcohol treatment program entitled the Spiritual Recovery Support Group ("SRSG"). SRSG provides intervention and support to veterans suffering from low self-esteem because of significant spiritual injuries, as measured by a Multi-Level Spiritual Assessment ("MLSA"). SRSG is a "vehicle for change and growth" because, according to the VA, "[w]hen God's gift of spiritual faith and grace is applied, it is good medicine." R.27, Ex. 26 at 1. A recommendation is made to veterans at Sheridan to attend SRSG whenever a veteran shows a significant spiritual injury as measured by the MLSA, which is offered to all patients at the Sheridan Medical Center.

The VA Medical Center in Gainsville, Florida also incorporates spirituality into its detoxification treatment program. Its program is entitled "Spirituality in Substance Abuse Detoxification Treatment." Finally, the Detroit VA Medical Center likewise integrates spirituality into its chemical dependency program. Its purpose is to "integrate the spiritual side of chemical dependency program into the multi-disciplinary treat-

ment plan" so treatment can be approached "from a holistic perspective." R.27, Ex. 28 at 4. The VA claims that these spiritual programs are offered on a voluntary basis, and Freedom From Religion does not put forth any evidence suggesting that there are no alternative, non-religious/spiritual programs available to veterans who refuse to participate in the programs to which Freedom From Religion objects.

## C. District Court Proceedings

On April 19, 2006, Freedom From Religion commenced this civil rights action under 42 U.S.C. § 1983 challenging the VA's integration of pastoral care into the medical care that it provides veterans and its use of chaplains for that purpose. Freedom From Religion sought three remedies from the district court: a judgment declaring that congressional taxpayer disbursements made by defendants have been used in violation of the Establishment Clause; an order enjoining the VA from continuing to disburse and use appropriations in violation of the Establishment Clause; and an order requiring the defendants to establish rules, regulations, prohibitions, standards and oversight to ensure that future disbursements are not used to fund activities that include religion as a substantive integral component of the VA's medical treatment protocols.

On October 16, 2006, after the district court denied its motion to dismiss the complaint, the VA moved for summary judgment. Applying *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and *Agostini v. Felton*, 521 U.S. 203 (1997), the district court granted the VA's motion. Under the first prong of the *Lemon* test, it determined that all four

aspects of the Chaplain Service that Freedom From Religion was challenging had a secular purpose. The clinical focus of the chaplaincy and its integration of religion/spirituality into VA treatment programs is intended to assist in healing the sick. The district court held that this was a valid secular purpose, as the Eighth Circuit held in *Carter v. Broadlawns Medical Center*, 857 F.2d 448, 454-55 (8th Cir. 1988). The use of the spiritual assessments also had a valid secular purpose, namely complying with the accreditation standards of JCAHO. Finally, the court held that the VA had offered a valid secular purpose for the provision of pastoral and spiritual care insofar as the VA believed that such care would help veterans and reduce operating costs.

Under the second prong of *Lemon*, the court held that, although the challenged aspects of the chaplaincy program integrate religion/spirituality, there was no government indoctrination. The court was satisfied that all aspects of the program that did incorporate religion were voluntary and that there was no coercion. Although the provision of outpatient care could not be justified as an accommodation of Free Exercise rights (given that outpatients are not confined and may practice their religion or obtain spiritual care on their own), it fell within what the Supreme Court has called the "room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Walz v. Tax Comm'n*, 397 U.S. 664, 673 (1970).

Finally, under *Lemon*'s third prong, the district court held that the four challenged aspects of the chaplaincy program did not result in excessive government entanglement with religion. The court noted that VA policy pro-

hibits proselytizing and that Freedom From Religion did not proffer any evidence that publicly paid VA chaplains must be monitored constantly to ensure that they do not inculcate religion.[10] Accordingly, the court granted the VA's motion for summary judgment.

Freedom From Religion appealed in a timely manner to this court.

## II

## DISCUSSION

Prior to addressing the merits of Freedom From Religion's appeal, we first must determine whether it has standing to maintain this action. Our judicial power may be exercised only within the context of "Cases" and "Controversies." *See* U.S. Const. art. III, § 2; *Hein v. Freedom From Religion*, ___ U.S. ___, 127 S. Ct. 2553, 2562 (2007). Article III standing jurisprudence serves to ensure that federal courts obey this constitutional command. *Hein*, 127 S. Ct. at 2562. The party that is invoking federal jurisdiction, here, Freedom From Religion, bears the burden of establishing Article III standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341-42 (2006). Although the VA is asserting lack of standing for the first time on

---

[10] In contrast, the district court explained that the order that Freedom From Religion sought as relief would create the potential for excessive entanglement. The court noted that Freedom From Religion requested an order requiring that the defendants establish rules, regulations, prohibitions, standards and oversight to ensure that future disbursements are not made or used to fund activities that include religion as substantive, integral components of VA medical treatment.

appeal, it is well settled that standing is not subject to waiver or forfeiture. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984) (alteration in original)).

All plaintiffs, including organizations, seeking to invoke federal jurisdiction must have standing. *See Sierra Club v. Morton*, 405 U.S. 727, 735, 739 (1972). An organization may assert "representational standing" if (1) "the organization's members . . . have standing to sue on their own"; (2) "the interests the organization seeks to protect are germane to its purpose"; and (3) "neither the claim asserted nor the relief requested requires individual participation by its members." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). In the present case, the plaintiffs are Freedom From Religion Foundation, Inc., a Wisconsin non-stock corporation that "opposes the use of congressional taxpayer appropriations to advance and promote religion," and three of its members, who are federal taxpayers. R.2 at ¶¶ 4-6, 7-10. All plaintiffs assert that they have standing to challenge certain aspects of the VA's Chaplain Service because they are federal taxpayers. Because the other elements of representational standing are not disputed and indeed are fulfilled, we need not distinguish between the individual plaintiffs and Freedom From Religion. After laying out the general principles that govern the standing inquiry, we shall address Freedom From Religion's standing arguments.

## A. Overview of Standing Jurisprudence

Federal taxpayers qua taxpayers, as a general matter, do not have standing in federal court. *Frothingham v. Mellon*, 262 U.S. 447, 487 (1923). In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court of the United States created a narrow exception to this general rule. *See Hein*, 127 S. Ct. at 2564; *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 481 (1982) (noting that the limited nature of the "*Flast* exception to the *Frothingham* principle ought to be applied" with "rigor"). In *Flast*, the Court set forth the standard under which a federal taxpayer may establish standing to bring an Establishment Clause challenge:

> First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8.

*Flast*, 392 U.S. at 102-03. "When both nexuses are established," the Court explained, "the litigant will have shown a taxpayer's stake in the outcome of the contro-

versy and will be a proper and appropriate party to invoke a federal court's jurisdiction." *Id.* Under these narrow circumstances, the Court understood the Establishment Clause to "operate[] as a constitutional limitation upon the exercise by Congress of the taxing and spending power conferred by Art. I, § 8" of the Constitution. *Id.* at 103-04.

The Supreme Court recently has provided significant guidance as to the breadth of the *Flast* exception to *Frothingham*'s general rule against taxpayer standing. *See Hein*, 127 S. Ct. 2553. The taxpayer-plaintiffs in *Hein* sought to challenge part of the President's Faith Based and Community Initiatives program. The program was funded by "general Executive Branch appropriations" from the federal treasury, and this was the taxpayer-plaintiffs' asserted basis for standing. The Court rejected the plaintiffs' taxpayer standing argument, with a plurality of the Court explaining that the "link between congressional action and constitutional violation that supported taxpayer standing in *Flast* [was] missing." *Hein*, 127 S. Ct. at 2566.[11] The plurality explained that the

> Respondents do not challenge any specific congressional action or appropriation; nor do they ask the Court to invalidate any congressional enactment or legislatively created program as unconstitutional. That is because the expenditures at issue here were not made pursuant to any Act of Congress. Rather, Congress provided general appropriations to the Executive

---

[11] Justice Alito's opinion, joined by Chief Justice Roberts and Justice Kennedy, is controlling because it expresses the narrowest position taken by the Justices who concurred in the judgment. *See Marks v. United States*, 430 U.S. 188, 193 (1977).

> Branch to fund its day-to-day activities. These appro-
> priations did not expressly authorize, direct, or even
> mention the expenditures of which respondents
> complain. Those expenditures resulted from execu-
> tive discretion, not congressional action.

*Id.* (footnote omitted). The plurality concluded that the
plaintiffs could not establish the "logical nexus between
taxpayer status and the type of legislative enactment
attacked" because the expenditures that they chal-
lenged "were not expressly authorized or mandated by
any specific congressional enactment." *Id.* at 2568
(internal quotation marks and citations omitted).

The plurality also rejected the plaintiffs' "attempt to
paint their lawsuit as a *Kendrick*-style as-applied chal-
lenge." *Id.* at 2567. In *Bowen v. Kendrick*, 487 U.S. 589 (1988),
the Supreme Court held that federal taxpayers had stand-
ing to bring an as-applied challenge to the Adolescent
Family Life Act ("AFLA"). The plurality in *Hein* ex-
plained that

> the key to that conclusion was the Court's recognition
> that AFLA was "at heart a program of disbursement of
> funds pursuant to Congress' taxing and spending
> powers," and that the plaintiffs' claims "call[ed] into
> question how the funds authorized by Congress [were]
> being disbursed pursuant to the AFLA's statutory
> mandate." [*Kendrick*, 487 U.S.] at 619-620 (emphasis
> added). AFLA not only expressly authorized and
> appropriated specific funds for grant-making, it also
> expressly contemplated that some of those moneys
> might go to projects involving religious groups. *See id.*,
> at 595-596; *see also id.*, at 623 (O'Connor, J., concurring)
> (noting the "partnership between governmental and
> religious institutions contemplated by the AFLA").

> Unlike this case, *Kendrick* involved a "program of disbursement of funds pursuant to Congress' taxing and spending powers" that "Congress had created," "authorized," and "mandate[d]." *Id.*, at 619-620.

*Hein*, 127 S. Ct. at 2567. The plaintiffs in *Hein* could only "point to unspecified, lump-sum 'Congressional budget appropriations' for the general use of the Executive Branch," and the plurality held that such a nexus was insufficient. *Id.* The Justices warned that

> [c]haracterizing this case as an "as-applied challenge" to these general appropriations statutes would stretch the meaning of that term past its breaking point. It cannot be that every legal challenge to a discretionary Executive Branch action implicates the constitutionality of the underlying congressional appropriation. When a criminal defendant charges that a federal agent carried out an unreasonable search or seizure, we do not view that claim as an as-applied challenge to the constitutionality of the statute appropriating funds for the Federal Bureau of Investigation. Respondents have not established why the discretionary Executive Branch expenditures here, which are similarly funded by no-strings, lump-sum appropriations, should be viewed any differently.

*Id.* at 2567-68.[12] Given that "*Flast* focused on congressional action," the plurality "decline[d] [the] invitation to ex-

---

[12] In a footnote, the plurality also noted that it was irrelevant that Congress had " 'earmarked' portions of the general Executive Branch appropriations to fund the officers and centers whose expenditures" were at issue in the case. *Id.* at 2568 n.7.

tend its holding to encompass discretionary Executive Branch expenditures." *Id.* at 2568.

Justice Scalia, in an opinion joined by Justice Thomas, concurred in the judgment, but he would have overruled *Flast* altogether. Justice Scalia explained that "a taxpayer's purely psychological displeasure that his funds are being spent in an allegedly unlawful manner [is never] sufficiently concrete and particularized to support Article III standing." *Id.* at 2582. *Flast*'s "two-pronged 'nexus' test," Justice Scalia wrote, does not resolve the "Article III deficiency," which is that "the taxpayer seeks 'relief that no more directly and tangibly benefits him than it does the public at large.'" *Id.* at 2582-83 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573-74 (1992)). Consequently, Justice Scalia concluded that "*Flast* should be overruled." *Id.* at 2584.

In *Hinrichs v. Speaker of the House of Representatives of the Indiana General Assembly*, we had occasion to apply *Hein*. In *Hinrichs*, the panel majority explained that "there are several guiding principles to take away" from *Frothingham*, *Flast* and their progeny. 506 F.3d 584, 598 (7th Cir. 2007). One such principle is that, outside of the narrow confines of *Flast*, "federal taxpayers may not lodge constitutional challenges against congressional appropriations." *Id. Flast*'s narrow exception "only applies when the taxpayer has established a 'logical link between [his taxpayer] status and the type of legislative enactment attacked' as well as a 'nexus between that status and the *precise* nature of the constitutional infringement alleged.'" *Id.* (quoting *Flast*, 392 U.S. at 102-03) (emphasis supplied). Another guiding principle that the panel majority articulated is that "the nexus between the plaintiff's taxpayer status and the legislative enactment must be a *direct one*." *Id.*

(explaining that "[t]he plurality of the Court made clear in *Hein* that only 'expenditures made pursuant to an express congressional mandate and a specific congressional appropriation' met the first nexus requirement; the plurality rejected the plaintiffs' claim that any 'expenditure of government funds in violation of the Establishment Clause' would meet this requirement" (quoting *Hein*, 127 S. Ct. at 2565)) (emphasis supplied).

Applying these principles, the panel majority in *Hinrichs* concluded that the plaintiffs did not have taxpayer standing to challenge the constitutionality of legislative prayer as implemented by the Indiana House of Representatives' "Minister of the Day" program. "The program, as it is presently administered, is not mandated by statute," the panel majority explained. Rather,

> [t]he origin of the practice is House Rule 10.2, and that rule merely provides that a prayer or invocation be given each meeting day before the House conducts any business. The manner in which the program is currently administered is a matter of House tradition, implemented at the discretion of the Speaker. Although there is some minimal amount of funds expended in the administration of the program, the plaintiffs have not pointed to any specific appropriation of funds by the legislature to implement the program.

*Id.* at 598. Under these circumstances, the plaintiffs had not established a direct nexus between their taxpayer status and the legislative enactment that they sought to contest. Specifically, the panel majority explained that

> [t]he plaintiffs have not tied their status as taxpayers to the House's allegedly unconstitutional practice of regularly offering a sectarian prayer. They have not

shown that the legislature has extracted from them tax dollars for the establishment and implementation of a program that violates the Establishment Clause. The appropriations, which cover the incidental costs of the program, "did not expressly authorize, direct, or even mention the expenditures," *Hein*, 127 S. Ct. at 2566, attendant to the "Minister of the Day" program. Instead, the plaintiffs allege only an " 'expenditure of government funds in violation of the Establishment Clause,' " which the Court explicitly rejected as inadequate in *Hein*. *Id.* at 2565 (internal citations omitted).

*Id.* at 599. Because the plaintiffs failed to show that the legislature "appropriat[ed] . . . funds for the allegedly unconstitutional purpose," the panel majority concluded that they could not establish the "link between taxpayer and expenditure necessary to support standing." *Id.* at 600.

## B.  Freedom From Religion's Challenge to the "Clinical Chaplaincy"

Freedom From Religion asserts that it has federal taxpayer standing to challenge certain aspects of the VA's Chaplain Service. It contends that *Hein* only requires that taxpayers challenge the use of congressional appropriations that are authorized to fund a congressionally-established program. If such funds are administered in a manner that allegedly violates the Establishment Clause, then, in Freedom From Religion's view, taxpayers have standing to sue. In the present case, Congress statutorily has directed the VA and, more specifically, the VHA, to provide medical care to eligible veterans as part of a congressionally-mandated spending program. VHA's

funding comes from annual congressional appropria-
tions, and Freedom From Religion emphasizes that these
appropriations are different from the lump sum, "petty
cash" or general account appropriations at issue in *Hein*.
Appellant's Br. at 21. As a result, Freedom From Religion
claims that it has established a link between its taxpayer
status and the legislative enactment that it seeks to chal-
lenge.

The VA, in response, claims that Freedom From Religion
can point to no specific congressional authorization of,
or funding for, the challenged aspects of the Chaplain
Service. Because the VA's authorization statute does not
specifically mention chaplains or their services and because
it was the VA's decision—not Congress'—to integrate
chaplain care into the VA's holistic approach to patient
care, Freedom From Religion cannot link the challenged
aspects of the Chaplain Service to a specific congressional
mandate or particular congressional appropriations, as
*Hein* requires.

We must observe, as a preliminary matter, that Free-
dom From Religion is not challenging the overall existence
of the Chaplain Service, nor does it contend that the VA's
employment of chaplains generally is violative of the
Establishment Clause. Indeed, it concedes that
chaplains "obviously perform religious activities, which
they can do to a limited extent to accommodate the consti-
tutional Free Exercise rights of hospitalized patients."
Appellant's Br. at 15. Its suit is limited to, what Freedom
From Religion terms, the "clinical chaplaincy" and the
VHA's provision of pastoral care. *Id.* at 16. In particular,
Freedom From Religion challenges (1) the clinical focus
of the chaplaincy; (2) the spiritual assessments that the
VA gives to its patients; (3) the provision of pastoral care

to VA outpatients; and (4) the integration of spirituality/religion into VA treatment programs.

Viewed in this light, we nevertheless believe that Freedom From Religion's suit does not fit within *Flast*'s narrow exception to the *Frothingham* principle. Although Congress has mandated that the VHA provide medical care to veterans and, at least in a broad sense, it has contemplated that the VA generally will provide chaplain services, *see* 38 U.S.C. § 7306(e)(1) (authorizing that a "member of the Chaplain Service" be designated "as Director, Chaplain Service"), no specific congressional action mandates, requires or even intimates that chaplains be used in any particular way to accomplish this goal. In its most recent appropriation for the VHA, Congress provided approximately $29 billion for "necessary expenses for furnishing, as authorized by law, inpatient and outpatient care and treatment to beneficiaries of the Department of Veterans affairs." Consolidated Appropriations Act, 2008, Div. I, Title II, Pub. L. No. 110-161, 121 Stat. 1844, 2264 (2007).[13]

Freedom From Religion has not shown that these appropriations to the VHA "expressly authorize" or "direct" the specific expenditures about which it complains. *See Hein*, 127 S. Ct. at 2566; *Hinrichs*, 506 F.3d at 599 (noting that there was a "lack of specific direction by the state

---

[13] *See also* Military Quality of Life and Veterans Affairs Appropriations Act, 2006, Title II, Pub. L. No. 109-114, 119 Stat. 2372, 2382-86 (2005) *amended by* Pub. L. No. 110-92, 21 Stat. 989 (2007); Consolidated Appropriations Act, 2005, Div. I, Title I, Pub. L. No. 108-447, 118 Stat. 2809, 3287-90 (2004); Consolidated Appropriations Act, 2004, Div. G, Title I, Pub. L. No. 108-199, 118 Stat. 3, 365-67 (2004).

legislature to establish the Minister of the Day program" and a "lack of specific appropriations dedicated to the program"); *cf. Am. United for Separation of Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 420 (8th Cir. 2007) ("In this case, the Iowa legislature made specific appropriations from public funds 'for a values-based treatment program at the Newton correctional facility . . . .' Therefore, Americans United and the individual tax-payer satisfy the narrow exception for taxpayer stand-ing." (internal citation omitted)). Those expenditures that Freedom From Religion seeks to challenge—funds used to develop a chaplaincy with a clinical focus, to create spiritual assessments, to provide pastoral care to outpatients, and generally to integrate spirituality/religion into VHA treatment programs—were not made pursuant to any express congressional action but rather resulted from "executive discretion." *Hein*, 127 S. Ct. at 2566, 2568 (declining to extend *Flast* to "encompass discretionary Executive Branch expenditures"); *Dist. of Columbia Common Cause v. Dist. of Columbia*, 858 F.2d 1, 3-4 (D.C. Cir. 1988) [hereinafter *Common Cause*] ("The [Supreme] Court has . . . refused to extend *Flast* to exercises of executive power . . . ."). Indeed, just as the challenged congressional appropriations in *Hein* and *Hinrichs* made no mention of the expenditures at issue in those cases, the appropria-tions here also do not mention chaplains generally or the role that chaplains should play in the medical care that the VHA furnishes to veterans. *See id.*; *Hinrichs*, 506 F.3d at 598-99 & n.8; *compare Am. United*, 509 F.3d at 420 (noting that the legislature appropriated funds expressly "for a values-based treatment program"). Freedom From Religion's lawsuit thus is not predicated, as *Hein* requires, on the notion that *Congress* appropriated money from

federal taxpayers expressly for the creation of a clinical chaplaincy.[14]

Instead, Freedom From Religion simply is challenging the executive branch's approach to veterans' healthcare and the manner in which the executive, in its discretion, uses the services of its chaplain personnel.[15] Allowing taxpayer standing under these circumstances would subvert the delicate equilibrium and separation of powers that the Founders envisioned and that the Supreme Court has found to inform the standing inquiry. *See Hein*, 127 S. Ct. at 2570 (cautioning that courts must not be "deputize[d]" into serving as "continuing monitors of the wisdom and soundness of Executive action" because such is "most emphatically . . . not the role of the judiciary" (internal quotation marks and citation omitted); *id.* at

---

[14] Freedom From Religion's suit also would fail under the approach taken by Justices Scalia and Thomas. These Justices would have overruled *Flast* and, accordingly, *Frothingham*'s rule of no taxpayer standing would pretermit the standing inquiry.

[15] *See, e.g.*, R.2 ¶ 35 ("*The VA* deems pastoral services for all patients, including veterans receiving out-patient medical services, to be a necessary substantive part of medical treatment . . . .") (emphasis added); *id.* ¶ 37 ("The VA expects chaplains to be involved as part of the medical treatment team for all patients . . . ."); *id.* ¶ 38 (challenging the VA's decision to "integrate[] chaplains services into patient medical care"); *id.* ¶ 41 (challenging chaplains' development of programs of "spiritual and pastoral care intended to ensure holistic health care"); *id.* ¶ 72 (contending that chaplains at a particular VA medical center "write monthly devotionals" published in a veterans association newsletter).

2573 (Kennedy, J., concurring) ("The courts must be reluctant to expand their authority by requiring intrusive and unremitting judicial management of the way the Executive Branch performs its duties."). For instance, the remedy that Freedom From Religion has requested for the VA's alleged violation of the Establishment Clause is "an order requiring the defendants [five high-level employees of the VA and members of the executive branch] to establishes rules, regulations, prohibitions, standards and oversight to ensure that future disbursements are not made and/or used" to provide pastoral care. R.2 ¶ b. We cannot "authorize the constant intrusion upon the executive realm that would result from granting taxpayer standing in the instant case." *See Hein*, 127 S. Ct. at 2573 (Kennedy, J., concurring).

We also cannot accept Freedom From Religion's argument that *Hein* allows taxpayer standing any time that funds appropriated for a congressionally established program are administered in a way that allegedly violates the Establishment Clause, even when the alleged maladministration bears no relationship to congressional action. This reading of *Hein* creates a chasm between the taxpayer's status and the "type of legislative enactment attacked," *Hein*, 127 S. Ct. at 2568; the Court declined to permit such a chasm in *Hein*, and we rejected the same sort of chasm, in reliance on *Hein*, when we decided *Hinrichs*. The plaintiffs there could not establish the requisite nexus between their taxpayer status and the challenged expenditures—those used for the administration of the Minister of the Day program—simply by pointing to the legislature's enactment of House Rule 10.2, which provided that each session would open with a prayer, and to its passing of a budget for the general operations of the legislature. We explained that

the plaintiffs do not challenge Rule 10.2; indeed, they acknowledge the constitutionality of some form of legislative prayer. Instead, it is the present practice of employing a minister of the day, and the resulting sectarian prayers, that the plaintiffs seek to enjoin. However . . . there is no specific appropriation either for Rule 10.2 or for the Minister of the Day program. Absent such an appropriation, the necessary link between the taxpayer and the expenditure for the allegedly unconstitutional practice has not been established.

*Hinrichs*, 506 F.3d at 599 n.8.

Freedom From Religion, like the plaintiffs in *Hinrichs*, concedes the constitutionality of the VA's employment of chaplains as a general matter. It only contests the VA's decision to use its chaplains to provide pastoral care. But, as we already have explained, Congress does not require, and has made no express appropriations for, the provision of pastoral care or the integration of chaplains in medical care generally. As a result, Freedom From Religion has not established the logical nexus required by *Flast*—it has not shown that *Congress* has extracted from it tax dollars for the establishment and implementation of a clinical chaplaincy.

In a similar vein, Freedom From Religion attempts to characterize its action as a challenge under *Bowen v. Kendrick*. The plurality in *Hein* explained that the "key" to *Kendrick*'s conclusion that *Flast*'s requirements had been met was that the plaintiffs in *Kendrick* were challenging *both* "a program of disbursement of funds pursuant to Congress' taxing and spending powers" *and* "how the funds authorized by Congress [were] being disbursed

*pursuant to the AFLA's statutory mandate." Hein*, 127 S. Ct. at 2567 (quoting *Kendrick*, 487 U.S. at 619-20) (emphasis in original). "AFLA not only expressly authorized and appropriated specific funds for grant-making," the Justices explained, "it also expressly contemplated that some of those moneys might go to projects involving religious groups." *Id.* (citing *Kendrick*, 487 U.S. at 595-96, and *id.* at 623 (O'Connor, J., concurring) (noting the "partnership between governmental and religious institutions contemplated by the AFLA")); *see also In re U.S. Catholic Conference*, 885 F.2d 1020, 1027 (2d Cir. 1989) [hereinafter *Catholic Conference*] ("In *Kendrick*, it was Congress that decided how the AFLA funds were to be spent, and the executive branch, in administering the statute, was merely carrying out Congress' scheme."). The plurality further explained that the statute in *Kendrick* had

> noted that the problems of adolescent premarital sex and pregnancy "are best approached through a variety of integrated and essential services provided to adolescents and their families" by "religious and charitable organizations," among other groups. 42 U.S.C. § 300z(a)(8)(B) (1982 ed.). It went on to mandate that federally provided services in that area should "emphasize the provision of support by other family members, religious and charitable organizations, voluntary associations, and other groups." § 300z(a)(10)(c). And it *directed that demonstration projects funded by the government "shall* . . . make use of support systems" such as religious organizations, § 300z-2(a), and required grant applicants to describe how they would "involve religious and charitable organizations" in their projects, § 300z-5(a)(21)(B).

*Hein*, 127 S. Ct. at 2568 n.6 (emphasis supplied).[16]

Turning to the case before us, the congressional action that Freedom From Religion challenges is missing these characteristics of the challenged action in *Kendrick*, characteristics that the plurality in *Hein* described as critical. Whereas in *Kendrick*, the challenged congressional action expressly contemplated that funds would be disbursed to religious organizations, the congressional action here—

---

[16] Although he concurred in the judgment, Justice Scalia, in an opinion joined by Justice Thomas, disagreed with the manner in which the plurality distinguished *Bowen v. Kendrick*, 487 U.S. 589 (1988). Justice Scalia wrote that the plurality's opinion "flatly contradicts *Kendrick*" because the "whole point of the as-applied challenge" in that case was "that the Secretary, not Congress, had chosen inappropriate grant recipients." *Hein*, 127 S. Ct. at 2580 (Scalia, J., concurring) (emphasis omitted). Justice Scalia nevertheless went on to conclude that "*Flast* should be overruled." *Id.* at 2584. Thus, given that Justices Scalia and Thomas would have overruled *Flast*'s narrow exception to the *Frothingham* principle, our decision in the present case is consistent with that view.

The four dissenting Justices also believed that the manner in which the plurality distinguished *Kendrick* was unpersuasive. *See id.* at 2586-87 (Souter, J., dissenting). Justice Souter noted that "the plurality points out that the statute in *Bowen* 'expressly authorized and appropriated specific funds for grantmaking' and 'expressly contemplated that some of those moneys might go to projects involving religious groups.' That is all true, but there is no reason to think it should matter, and every indication in *Bowen* that it did not." *Id.* (quoting *Hein*, 127 S. Ct. at 2567). The dissenting Justices would have extended *Flast* to allow the challenge of discretionary executive actions that allegedly violate the Establishment Clause.

the statutory mandate that the VHA provide medical care to veterans—does not contemplate that any funds would be disbursed to support the particular aspects of the Chaplain Service that Freedom From Religion contests. *See Hein*, 127 S. Ct. at 2565. Further, the challenged congressional action in *Kendrick* directed or guided the manner in which the executive could exercise the discretionary task of awarding federal grants under the AFLA. *Id.* at 2568 n.6 (noting that the statute in *Kendrick* directed that, in awarding grants under AFLA, the executive "*shall* . . . make use of support systems such as religious organizations" (internal quotation marks omitted) (emphasis supplied)); *see also Catholic Conference*, 885 F.2d at 1028 (rejecting an assertion of taxpayer standing under *Kendrick* where the plaintiffs were not challenging Congress' exercise of taxing and spending power in enacting the Internal Revenue Code but the manner in which the executive was implementing the Code); *Catholic Conference*, 885 F.2d at 1027 (noting that, in *Kendrick*, the executive "was merely carrying out Congress' scheme"). In the present case, however, there is an absence of any direction, guidance or indication on the part of Congress as to how the VHA should expend the funds appropriated for medical care or, more generally, as to how the VHA should employ its chaplains. Essentially, Freedom From Religion is challenging parts of the Chaplain Service that have been established wholly at the discretion of the executive. These differences, which the *Hein* plurality found critical, *see Hein*, 127 S. Ct. at 2567-68, lead us to hold that Freedom From Religion may not characterize its lawsuit as an as-applied challenge under *Kendrick*.

This conclusion is consistent with the *Hein* plurality's discussion of *Kendrick* as well as with the Court's dis-

tinct and consistent focus, dating back to *Flast* itself, on *congressional action*. *See Hein*, 127 S. Ct. at 2565-69; *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 479 (1982); *Schlesinger v. Reservist Comm. to Stop the War*, 418 U.S. 208, 228 (1974); *United States v. Richardson*, 418 U.S. 166, 175 (1974); *Flast*, 392 U.S. at 90. In *Valley Forge*, for example, the plaintiffs sought to challenge "a decision by the [then-Department of Health, Education and Welfare] to transfer a parcel of federal property" to a Christian college. 454 U.S. at 479. The Court explained that the transfer was "arguably authorized" by the Federal Property and Administrative Services Act of 1949, a law that allowed federal agencies to transfer surplus property to private entities. *Id.* at 479 n.15. Despite this link between the wholly discretionary executive decision that allegedly violated the Establishment Clause and an act of Congress that authorized that decision, the Supreme Court held that the plaintiffs did not have standing because *Flast* "limited taxpayer standing to challenges directed 'only [at] exercises of congressional power.' " *Id.* at 479 (quoting *Flast*, 392 U.S. at 102).

Freedom From Religion's lawsuit is not predicated on the notion that *Congress* appropriated money from federal taxpayers expressly for the creation of a clinical chaplaincy. Moreover, given the *Hein* plurality's discussion of *Kendrick*, the aspects of the Chaplain Service being challenged here are too far removed from any congressional action to support taxpayer standing under *Kendrick*. Consequently, we hold that Freedom From Religion has not "establish[ed] a nexus between that status and the precise nature of the constitutional infringement alleged." *Flast*, 392 U.S. at 102-03.

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is vacated, and the case is remanded to the district court with instructions to dismiss for want of jurisdiction.

VACATED and REMANDED WITH INSTRUCTIONS