# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2018-0239, <u>Neal Kurk v. Thomas Clow & a.</u>, the court on May 9, 2019, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. This case arises out of the calculation of the Town of Weare's 2018 default budget pursuant to RSA 40:13 (Supp. 2017) (amended 2018). The defendants, the Town of Weare, Thomas Clow, and other members of the town's board of selectmen, appeal orders by the Superior Court (<u>Nicolosi</u>, J.) denying their motion to dismiss and granting the relief requested by the plaintiff, Neal Kurk. On appeal, the defendants argue that the trial court erred in ruling that: (1) the plaintiff has standing to bring this suit; (2) the 2018 default budget improperly included the cost of certain contracts the town entered into in 2017; and (3) the plaintiff was entitled to an award of attorney's fees. We affirm, in part, and reverse, in part.

The relevant facts follow. The town is a Senate Bill 2 town that passes its budget by an official ballot pursuant to RSA 40:13. Under the statute, the governing body of the town presents both a proposed operating budget and a default budget to the voters. RSA 40:13. In the event the proposed operating budget fails to pass, the default budget is imposed unless the governing body, in this case the board of selectmen, elects to proceed to a special meeting pursuant to RSA 40:13, XVI (Supp. 2018). RSA 40:13, X (Supp. 2018). The default budget is defined as:

> [T]he amount of the same appropriations as contained in the operating budget authorized for the previous year, reduced and increased, as the case may be, by debt service, contracts, and other obligations previously incurred or mandated by law, and reduced by one-time expenditures contained in the operating budget. For the purposes of this paragraph, one-time expenditures shall be appropriations not likely to recur in the succeeding budget, as determined by the governing body, unless the provisions of RSA 40:14-b are adopted, of the local political subdivision.

RSA 40:13, IX(b) (Supp. 2017) (amended 2018). The board of selectmen calculated a default budget for 2018 and published a document entitled "2018 Budget Worksheet" that included the default budget.

In February 2018, after the default budget was published and before the town voted, the plaintiff initiated a declaratory judgment action against the defendants seeking a temporary and permanent injunction. He alleged that $59,864 in budget increases were improperly included in the default budget because they were the result of contracts entered into by the board of selectmen after the last town meeting and without a vote by the citizens of Weare. The plaintiff asserted that although the contracts were valid, they did not qualify as "contracts . . . previously incurred" under the statute, and thus, could not be included in the default budget without approval by the town. See RSA 40:13, IX(b).

In response, the defendants filed both an answer contesting the merits and a motion to dismiss for lack of standing. Following a hearing, the trial court denied the defendants' motion to dismiss and granted the relief requested by the plaintiff. In its order, the trial court found that the plaintiff had standing because he established that he would suffer actual, concrete harm in the form of paying higher taxes if the default budget went into effect. On the merits, the trial court found that the board of selectmen improperly included the contested contracts in the default budget calculation. Engaging in statutory interpretation, the trial court determined that the phrase "previously incurred" set forth in RSA 40:13, IX(b) was ambiguous. The court then considered the overall statutory scheme and concluded that the "contracts . . . previously incurred" that increase the default budget must be previously voted on at a town meeting. See RSA 40:13, IX(b). Accordingly, the trial court ordered the defendants to remove the contracts identified by the plaintiff from the default budget before presenting the budget at the upcoming deliberative session.

Shortly thereafter, the plaintiff filed a motion for attorney's fees, which the trial court granted over the defendants' objection. The trial court found that the plaintiff conferred a substantial benefit on the public by providing the citizens of Weare with an opportunity to provide "meaningful input" on the "appropriation of money by the governing body" that increases the default budget. The court determined that this benefit to the citizens of Weare "extends beyond the confines of the instant litigation." This appeal followed.

The defendants argue that the trial court erred when it found that the plaintiff had standing to bring this lawsuit. Following briefing on appeal, the plaintiff moved to strike the standing issue, arguing that a constitutional amendment, approved by the voters of New Hampshire in the November 2018 election, grants him standing. The defendants counter that the constitutional amendment does not apply retroactively. We need not reach this issue because we conclude that the plaintiff has standing under the law in effect at the time the case was decided in the trial court.

2

When the relevant facts are not in dispute, we review de novo the trial court's determination on standing. State v. Actavis Pharma, 170 N.H. 211, 214 (2017). "[S]tanding under the New Hampshire Constitution requires parties to have personal legal or equitable rights that are adverse to one another, with regard to an actual, not hypothetical, dispute, which is capable of judicial redress." Duncan v. State, 166 N.H. 630, 642-43 (2014) (citations omitted).

The defendants contend that the plaintiff lacks standing because he alleges the same harm as every other taxpayer and fails to allege an actual, as opposed to hypothetical, harm. As to the defendants' first point, the plaintiff counters that there is no requirement that a party suffer a "unique injury" to establish standing. We agree with the plaintiff. Although a person's status as a taxpayer is not, by itself, sufficient to establish standing, taxpayer status in conjunction with an injury or an impairment of rights can confer standing. See Baer v. N.H. Dep't of Educ., 160 N.H. 727, 730-31 (2010); see also Duncan, 166 N.H. at 645 (to bring a declaratory judgment action under RSA 491:22, a party must establish that some right of the party has been impaired or prejudiced by the application of a rule or statute). The United States Supreme Court discussed what kind of personal injury confers standing and held that:

> As a general matter, the interest of a federal taxpayer in seeing that Treasury funds are spent in accordance with the Constitution does not give rise to the kind of redressable "personal injury" required for Article III standing. Of course, a taxpayer has standing to challenge the collection of a specific tax assessment as unconstitutional; being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer.

Hein v. Freedom From Religion Foundation, Inc., 551 U.S. 587, 599 (2007).

Here, the plaintiff contends that the calculation of the default budget will impair his personal rights by illegally increasing his taxes. Specifically, he asserts that the town's default budget proposed to "take money from his pocket," without the legislative body's approval of the contracts, in violation of RSA 40:13. This is not simply a case where a plaintiff asserts standing as a taxpayer and contests the spending or allocation of the funds at issue. See Duncan, 166 N.H. at 646 (petitioner's claim that a program will result in "net fiscal losses" to local governments does not articulate a personal injury); Baer, 160 N.H. at 730-31 (holding that petitioners lacked standing as taxpayers because they failed to demonstrate how certain waiver rules that allowed their taxes to be used to finance certain schools in the community impaired or prejudiced their rights). Instead, the plaintiff here is contesting the collection of a specific tax assessment, arguing that it is based upon an unlawful default budget calculation. Although the increased taxes will impact all of the taxpayers in the town, not just the plaintiff, that does not mean that the plaintiff's personal rights are not sufficiently impaired to confer standing.

The defendants further assert that the plaintiff lacks standing because the alleged increase in his taxes would occur only if the town did not vote to adopt the proposed budget, a vote which had not yet taken place when the hearing was held in this matter. The plaintiff counters that he would have suffered "real prejudice and real injury if the town [had been] permitted to include the challenged contracts in its default budget" because, under the default budget, the town asserted the right to collect his money as taxes.

Despite the defendants' contention that the plaintiff's alleged injury was merely hypothetical at the time he filed suit, it was not a speculative injury, as was the harm alleged in Duncan. In Duncan, the plaintiffs challenged a tax credit program, arguing that it would impose net fiscal losses on New Hampshire governments and would take state funding away from public schools. Duncan, 166 N.H. at 646-47. There, we held that the plaintiffs lacked standing because the purported personal injury — the loss of money to local school districts as a result of certain legislation creating a tax credit program — was speculative. Id. at 646-67. Specifically, the prospect that the net fiscal losses would occur "require[d] speculation about whether a decrease in students [would] reduce public school costs and about how the legislature [would] respond to the decrease in students attending public schools, assuming that occurs." Id. at 647. Consequently, the plaintiffs could not demonstrate whether local governments would, in fact, experience "net fiscal losses." Id. By contrast, here, the plaintiff alleges a concrete, actual injury that he would directly suffer if the default budget were to be imposed. The increased taxes were not an abstract possibility; the default budget had been calculated and published as the budget that the town would adopt in the event that the residents rejected the proposed operating budget and did not elect to hold a special meeting. See RSA 40:13, X. Accordingly, the plaintiff has standing.

Next the defendants argue that the statute authorizes the selectmen to enter into the challenged contracts and include them in the default budget. The plaintiff does not dispute the selectmen's authority to enter into the same contracts. See, e.g., RSA 41:10-a (2012) (allowing selectmen to appoint and compensate members of the New Hampshire bar to serve as municipal prosecutors); RSA 105:1 (Supp. 2018) (selectmen may designate one of the police officers as chief of police). However, the parties disagree as to whether those contracts could be included in the default budget as defined in RSA 40:13, IX(b).

The defendants argue that the reference in RSA 40:13, IX(b) to "contracts . . . previously incurred," allows them to include in the default budget contracts they entered into after the last town meeting. Furthermore, they contend that nothing about the purpose of the default budget "limits the contracts to be included in the default budget to the amounts previously approved by town meeting."

4

Resolution of this issue requires that we engage in statutory interpretation. We review the trial court's statutory interpretation de novo. Franciosa v. Hidden Pond Farm, 171 N.H. 350, 355 (2018). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. Id. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Id. Moreover, we do not consider words or phrases in isolation, but rather within the context of the statute as a whole. Id. This construction enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. Id. When statutory language is ambiguous, however, we will consider legislative history and examine the statute's overall objective and presume that the legislature would not pass an act that would lead to an absurd or illogical result. See STIHL, Inc. v. State of N.H., 168 N.H. 332, 334-35 (2015).

The defendants contend that the trial court erred in finding the statute ambiguous. In support of their argument, the defendants rely upon the dictionary definition of the term "incur," and conclude that, because the term is defined as meaning to "become liable or subject to," see Webster's Third New International Dictionary 1146 (unabridged ed. 2002), the identified contracts — which, all parties agree, were legitimately entered into — were previously incurred and properly included in the default budget. We disagree. The phrase "contracts . . . previously incurred" fails to specify precisely when such contracts were entered into or whether they required approval by the legislative body of the town. In addition, the entire subsection defining "default budget" does not provide context beyond a reference to the previous year's budget. Thus, because the "language is subject to more than one reasonable interpretation," we agree with the trial court that the statutory provision is ambiguous. Attorney General, Dir. of Charitable Trusts v. Loreto Publ'ns, 169 N.H. 68, 74 (2016) (quotation omitted).

We also agree with the trial court that this ambiguity can be resolved by examining the overall statutory scheme, specifically RSA chapter 32. Although the defendants contend that it is irrelevant and only addresses the actions the selectmen may take during the year after the budget is adopted, RSA chapter 32, the Municipal Budget Law, provides significant guidance for the creation of the budget. It does not apply solely to post-budget approval; rather, sections of the chapter also apply to the creation of the budget before it is enacted by the town. See, e.g., RSA 32:4 (2000), :5, II (Supp. 2018), :5-b (Supp. 2018), :5-c (Supp. 2018), :6 (2000), :8 (2000). For instance, RSA 32:5, II prohibits the governing body or budget committee from making alterations to a proposed

5

budget without providing a hearing.  RSA 32:8 provides that "[n]o board of selectmen . . . shall pay or agree to pay any money, or incur any liability involving the expenditure of any money, for any purpose in excess of the amount appropriated by the legislative body for that purpose, or for any purpose for which no appropriation has been made."  We have previously noted that the purpose of RSA chapter 32 was "to establish some uniformity in the manner of appropriating and expending public moneys in the various municipalities of the State and to establish the safe ceiling on the total indebtedness beyond which a municipality could not expend money."  Ashley v. School Dist., 111 N.H. 54, 56-57 (1971) (citation omitted).  We agree with the trial court's interpretation that "[n]one of the safeguards set forth in RSA chapter 32 have any force and effect if the board of selectmen is capable of unilaterally increasing the default budget by an unchecked amount."  Therefore, the defendants' interpretation of the statute undermines the overall purpose of the statutory scheme.

The defendants further argue that in February 2018, when this case was decided by the trial court, the term "previously incurred" did not equate to "previously approved" as evidenced by the subsequent amendment to RSA 40:13, adopted shortly after the trial court's decision.[1]  See Laws 2018, 241:2.  Specifically, the defendants argue that according to a report by a legislative subcommittee of the municipal and county government committee, the amendment to RSA 40:13 sought to redefine "contracts" and we should give weight to this report.  See Supervisory Union 29 v. N.H. Dep't of Educ., 125 N.H. 117, 122 (1984).  The defendants contend that because the subcommittee report includes the word "redefining," then we should conclude that the amendment's purpose was to redefine "contracts."  The plaintiff counters that we should look to the full committee report that was subsequently provided to the entire House of Representatives, which contains contradictory language and demonstrates that the statutory language is meant to be construed in the same manner as did the trial court.  We agree with the plaintiff.

The circumstances in Supervisory Union 29 are similar to those present here.  Id.  In that case, we noted that comments concerning prior law which are contained in the legislative history of a subsequent amendment enacted by a subsequent legislature, although not controlling, are entitled to some consideration.  Id.  We held that the legislative history of the amendment at issue supported the conclusion that, by the amendment, the legislature intended to clarify or interpret an ambiguity in the existing law and not to effect a change in legal rights.  Id. at 123.

---

[1] The amendment to RSA 40:13 added a definition of "contracts," defining it as: "contracts previously approved, in the amount so approved, by the legislative body in either the operating budget authorized for the previous year or in a separate warrant article for a previous year."  RSA 40:13, IX(c) (Supp. 2018).

We come to a similar conclusion here.  The full committee report discussing the amendment to RSA 40:13 provides, in part, that:

> The bill . . . adds a definition, recently tested in superior court, to stipulate that "contracts" and their amounts are those included in the previous year's operating budget or in previous separate warrant articles.  Defining how contracts are to be used in the construction of default budgets is intended to align this element of default budget construction more clearly with the concept that a default budget should freeze the previous year's budget in place.

N.H.H.R. Jour. Vol. 40, at 45 (Mar. 2, 2018) (discussing HB 1307).

The legislative history does not indicate that we should construe the statute differently than did the trial court.  The subsequent amendment merely clarifies the term "contract" — it does not effect a change in legal rights.  Thus, based upon the statutory scheme as a whole, we conclude that RSA 40:13, IX requires that the "contracts . . . previously incurred" that increase the default budget be previously voted on at a town meeting.  Accordingly, the default budget defined by the statute captures multi-year contracts, such as collective bargaining agreements, that had been approved at a prior town meeting and which reduce or increase, "as the case may be," the subsequent annual appropriation set forth in the default budget.  RSA 40:13, IX.  Similarly, a default budget also captures any other multi-year contract provided that the full, multi-year cost of the contract was disclosed and discussed at the town meeting during which the contract was approved.  Therefore, we affirm the trial court's decision to grant the plaintiff declaratory relief.

Next, the defendants argue that the trial court erred in awarding the plaintiff attorney's fees based upon its finding that the plaintiff conferred a substantial benefit to the public.  More specifically, the court found that the plaintiff's lawsuit conferred upon the voters of Weare the benefit of providing them with an opportunity to decide whether to appropriate funds towards contracts entered into by the board of selectmen that increase the default budget.  The court noted that the budget process impacts every citizen of Weare and "the practical effect of including the challenged contracts in the default budget is the appropriation of money by the governing body without any meaningful input by the voters of the town."

We review a trial court's award of attorney's fees under our unsustainable exercise of discretion standard, giving deference to the trial court's decision.  Shelton v. Tamposi, 164 N.H. 490, 501 (2013).  When reviewing a trial court's award of attorney's fees, we will uphold the trial court's factual findings unless they are erroneous as a matter of law or unsupported by the evidence.  Taber v. Town of Westmoreland, 140 N.H. 613, 615 (1996).  To be reversible on appeal, the trial court's discretion must have been exercised

for reasons clearly untenable or to an extent clearly unreasonable to the prejudice of the objecting party. Shelton, 164 N.H. at 501.

New Hampshire adheres to the American Rule; that is, absent statutorily or judicially created exceptions, parties pay their own attorney's fees. Board of Water Comm'rs, Laconia Water Works v. Mooney, 139 N.H. 621, 628 (1995). One judicially created exception is the substantial benefit theory, by which attorney's fees may be awarded when a litigant's action confers a substantial benefit upon the general public. Bedard v. Town of Alexandria, 159 N.H. 740, 744 (2010).

The defendants argue that if we affirm the trial court on the merits, that, at most, amounts to a finding of an erroneous application of the law by the board of selectmen, which is not sufficient to award attorney's fees. In support of its argument, the defendants rely upon Taber, where we recognized that "[w]e have never held that forcing the losing party to a strict adherence to the law is a sufficient benefit conferred on nonparties to justify awarding attorney's fees to the prevailing party." Taber, 140 N.H. at 615. Here, even though the trial court determined that "[t]he impact on third parties to this lawsuit is . . . much more concrete than in Taber, and is more significant than merely forcing 'strict adherence to the law,'" see id., we disagree.

In reaching our decision in this case, we, like the trial court, conclude that RSA 40:13, a statute that we have not previously had an occasion to interpret, is ambiguous. It is undisputed that the board of selectmen did not intentionally violate the statute. Rather, the board simply disagreed with the plaintiff's interpretation and application of RSA 40:13 to the default budget, which led to a disparity of less than $60,000 between the previous year's budget and the 2018 default budget originally presented to the voters. While "[t]he good or bad faith of the defendants is not a consideration in the award of attorney's fees under th[e substantial benefit] exception," Claremont School Dist. v. Governor (Costs and Attorney's Fees), 144 N.H. 590, 595 (1999) (quotation omitted), we hold that, as a matter of law, the disparity here at issue did not confer a "substantial benefit" upon the voters of Weare.

Moreover, to the extent that the trial court rationalized its award of attorney's fees on the benefit of ensuring the voters a more meaningful opportunity to approve those contracts that the governing body enters into which increase the default budget, we conclude that such reasoning is speculative and unsupported by the evidence. In this case, the citizens of Weare did not vote on the contested contracts; instead, the selectmen were ordered to remove the contracts from the default budget. Neither we, nor the trial court, can infer what impact, if any, the opportunity to vote on the challenged contracts, or the board of selectmen's removal of these contracts from the 2018 default budget had, on the decision the voters made in 2018 or will make in any subsequent year.

Nonetheless, the plaintiff maintains that the public interest in this case is similar to the interest that supported the award of attorney's fees in Irwin Marine, Inc. v. Blizzard, Inc., 126 N.H. 271 (1985).  There, we concluded that the plaintiff had conferred a substantial benefit upon the citizens and taxpayers of Laconia by insisting upon a requirement of fairness in the city's public bidding procedures.  See Irwin Marine, Inc., 126 N.H. at 277.  The plaintiff argues that, as in Irwin Marine, his efforts "prevent[ed] the government from taking action that deprives the public of a government that exercises fair powers of administration while looking after the public weal."  Although the plaintiff's primary purpose in litigating the case may not have been to advance his "own personal benefit," see Taber, 140 N.H. at 616, the record in this case does not suggest that his intended purpose was to rectify an injustice or unfairness with the selectmen's governance of the town's affairs.

In fact, the plaintiff's counsel made the following representations to the trial court at the hearing:

> The town . . . has been very responsive and helpful.  This is not a situation where we're claiming that . . . they're up to no good . . . . to their credit, they show all their work . . . they're not hiding what they're doing.  They're putting it all out [there] for people to see . . . .  It's just our position that what they're showing when they do show their work is something that's outside the scope of what they're permitted to do.

The facts in this case are more aligned with the sentiment expressed in Taber, where we reasoned that "forcing the losing party to a strict adherence to the law is [not] a sufficient benefit conferred on nonparties to justify awarding attorney's fees to the prevailing party."  Id. at 615.  Accordingly, we conclude that, under these unique circumstances, the trial court's award of attorney's fees is an unsustainable exercise of its discretion.

Affirmed in part;
reversed in part.

LYNN, C.J., and HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Eileen Fox,
Clerk**

9